I–GOTCHA, INC. d/b/a Wranglers,
Appellant,

v.

Melissa McINNIS, Individually, John Allen McInnis, Sr., Individually, and Melissa McInnis and John Allen McInnis, Sr. as the Heirs and Representatives of the Estate of John Allen McInnis, Jr., Deceased, and Jeffrey Elder, Appellees.

No. 2–94–127–CV.

Court of Appeals of Texas,
Fort Worth.

July 13, 1995.

Rehearing Overruled Sept. 7, 1995.

John L. Gamboa, Acuff, Gamboa & Moore, L.L.P., Fort Worth, for appellant.

Carol Ann Carson, John S. Jose, Jose, Henry & Brantley, Clay B. Peebles, Peebles, Betty & Brantley, Fort Worth, for appellees.

Before PAT McCLUNG, J. (Retired), and BILL J. STEPHENS, J. (Assigned).

## OPINION

STEPHENS, Justice, Assigned.

Melissa McInnis, John Allen McInnis, Sr., individually and as heirs and representatives of the estate of John Allen McInnis, Jr. ("John"), and Jeffrey Elder ("Jeff") sued I–Gotcha, Inc. d/b/a Wranglers ("I–Gotcha") under certain provisions of the Texas Alcoholic Beverage Code and the Texas Wrongful Death Statute. The jury awarded John's parents and Jeff actual damages and punitive damages. The jury attributed forty-nine

percent (49%) of the negligence to John and Jeff and fifty-one percent (51%) of the negligence to I–Gotcha. The jury's actual damage findings were reduced accordingly.

Appellant presents thirteen points of error on appeal. We disagree with each point of error, and accordingly, we affirm the judgment of the trial court.

## THE ACCIDENT

John had always been a popular child who enjoyed being around other people. He and his brother, Jeff McInnis, were the center of their parents', John Allen McInnis, Sr. and Melissa McInnis, lives. During July 1990, John was on summer break preparing for his senior year at Arlington Heights High School. John had always been very involved in sports. He showed promise in both baseball and football; he played catcher for the baseball team and quarterback for the football team. John intended to go to college, and his father believed John had a good chance to play college football or baseball.

On the night of July 12, 1990, after John got off of work, he went to the home of Chad Arnett ("Chad"), arriving around 10:30 p.m. John was drinking a cup of beer when he arrived. John changed from his work shirt into blue cut-offs, a white T-shirt, athletic socks, and Nikes. Jeff and several other friends were already at Chad's house watching television. Jeff had been at Chad's house since around 8:00 p.m. and had been drinking beer.

Chad, Jeff, and John decided to go to Wranglers Club ("Wranglers"), a topless bar in west Fort Worth. Neither John nor Jeff had been to Wranglers before. Chad, however, had been to Wranglers three to five times in the prior year, though he could not remember the exact dates or with whom he went. Both Jeff and Chad testified they went to Wranglers to drink because they knew it to be a place where minors could get in. Chad explained, "A lot of kids from [Arlington Heights] high school went there and drank on the weekends late at night" because Wranglers had a reputation for being an easy place for minors to get in. In addition, Jeff had never been to a topless bar and thought it would be fun to go. By the time the trio left for Wranglers, Jeff had consumed about a six-pack of beer, and John had consumed approximately a twelve ounce cup of beer.

At trial, Chad indicated he understood he was admitting to criminal behavior, but testified that John, Jeff, and he went to Wranglers the night of July 12, 1990. Jeff testified they got to the bar around midnight, earlier than Chad's recollection. As they entered the door at Wranglers, there was a small booth in which a club employee sat. At the booth, John paid his money and walked in. Both Chad and Jeff testified that John entered Wranglers without presenting any type of identification. Further, John told Chad that he did not have a fake ID before they left Chad's house to go to the bar. Chad was asked for identification when he entered the bar, and Jeff, following Chad, went ahead and pulled out his ID without being asked for it. Chad and Jeff both used fake IDs to get into Wranglers. Chad testified that it was well-known just about any ID, no matter how bad, would gain you admittance into Wranglers. Chad's ID "was basically a piece of paper with [his] name on it." Jeff's ID read "Arkansas Department of Identification" on the front, and on the back appeared the words "[t]his is not a real ID. This is a novelty item." The ID had Jeff's picture on it and his correct day of birth, but had a different year of birth so that he appeared to be twenty-one. The employee in the booth "just glanced at" Jeff's ID. Jeff explained that the boys "had to go around that little kind of partition right there. Then you walked in, you were in the club, and we walked straight to the bar on the back wall."

Once they were inside Wranglers, the trio were not surprised when they saw other high school students in Wranglers whom they recognized—"It was common to see other people there you knew when you went." Chad saw another high school student from Arlington Heights and five or six kids from Paschal High School. Jeff saw Michael Ryatt and several other people younger than him, either sophomores or juniors from Arlington Heights High School whose faces he recognized, but whose names he did not know. Jeff also saw several students from Paschal

High School. All of the high school kids congregated in the same vicinity of the bar. There were about a dozen other patrons in the club that night. At trial, Chad drew the layout of Wranglers and indicated that the group sat by the stage.

Once in the club, the three boys went to the bar. Jeff ordered a beer, while John and Chad both ordered a drink with tequila. Chad said they were shots and Jeff was unsure whether it was a margarita or a straight shot of tequila. The trio ordered from the same bartender, and none of the three were asked for ID. The other high schoolers were also consuming alcohol, and Jeff never saw a waitress or bartender ask them for ID. Jeff just had a few beers while he was there because he "was broke," but he never saw John "without a drink in his hand." Jeff saw John with both beer and tequila, and he observed John take three shots. Chad testified John had four or more tequila shots and about five beers. While at the bar, Jeff noticed John was "kind of slurring his speech a little bit, and his eyes were getting kind of squinty." Chad admitted that they were all drunk and were drinking quite a bit of alcohol, but he could not remember if the group was "boisterous" while they were in the club or when they were leaving.

Around closing time, some of the personnel of the bar were trying to clear the bar out. No one at Wranglers tried to call a cab for the boys, told them John should not be driving, asked if they had a designated driver, or offered coffee or soft drinks and time to sober up. It never crossed Chad's mind to call a cab, even though none of them were sober enough to drive. They left the bar around 2:00 a.m. to go to Chad's house. Chad could not remember much of anything about the ride back to his house. Jeff testified they went down Camp Bowie and John was speeding. Chad's house was five or six miles from the bar.

Chad testified that all three of the boys were intoxicated at that point, but both Chad and Jeff testified that John did not consume any more alcohol after leaving Wranglers. John and Jeff dropped Chad off, stayed in the yard for a while "shooting the bull," and

left. Chad testified John stayed in the yard for about half an hour, but Jeff testified they stayed at Chad's house for only about fifteen minutes. Chad did not see or notice anyone falling down or throwing up while they stood in the yard. John never got out of the car during this time. Jeff got back in the car with John to go home.

When Jeff and John got on the highway, John was speeding down I–30 West. Jeff told him to slow down, but John did not reply. Jeff wanted him to slow down and stop so that he could drive instead of John, but he ran out of time. As the red Acura was speeding around the bridge at the I–30/820 Interchange, John began to lose control of the Acura and it started to fishtail. As the car ran up against the guard rail, John turned the car quickly. The car flipped over three times, bounced off the side of the bridge, and landed in the grass. Jeff first noticed his hand, which had been out the window when John lost control of the car, was injured. Then Jeff realized that John was not in the car, and found where he had been thrown. Jeff ran down 820 trying to flag somebody down, but no one would stop. He continued to run and eventually stopped at a Whataburger in Benbrook where someone called the emergency vehicles. Jeff was taken to the hospital. Three of his fingers were nearly amputated and required surgery. Jeff testified he told his parents that he was at Wranglers that night, but he never told anyone else that they had been at Wranglers.

The wreck occurred ten to twelve miles from Chad's house. John died at 2:51 a.m. on July 13, 1990, of multiple blunt force impact fractures to his skull. The Tarrant County Medical Examiner originally identified him by the only ID he had on him, a valid Texas Driver's License that showed him to be seventeen years old. Angela Springfield, the chief toxicologist for the Tarrant County Medical Examiner's Office, testified John had a blood alcohol level of .38 grams per hundred milliliters of blood at the time of his death, nearly four times the legal level for intoxication. This level would have been close to "alcohol poisoning." She testified John would have had a blood alcohol level

between .30 and .38 while at Wranglers and that he would have been exhibiting slurred speech, an uneven gait or staggering, and expansive movements during that time.

At the time of trial, Jeff was doing a little work as a ranch hand for different ranches in Aledo and attending Weatherford College studying ranch management. He still needed more reconstructive surgery to get his pinky finger to bend properly and to get his nail beds rebuilt. The injury to the pinky finger interfered with many parts of Jeff's work. He also had a hard time writing or typing and suffered embarrassment when shaking hands with people. For a long time after the wreck, he also had a hard time sleeping.

At the time of trial, the McInnis family was still trying to deal with John's death. Mr. McInnis believed John would have had a good chance to play football or baseball in college and missed looking forward to having his son as a companion and watching him continue to develop. Three and half years after the accident, Mrs. McInnis continued to be withdrawn and to cry a lot. Jeff McInnis, John's younger brother, experienced periods of rage because he had difficulty expressing his feelings of missing the companionship and friendship of his older brother.

## THE GENTLEMEN'S CLUB

Walt Duncan, the owner of Wranglers Club, has over twenty years' experience in the bar business. He is the sole shareholder of I–Gotcha, Inc., the corporate defendant in the case. On July 12, 1990, I–Gotcha, Inc. owned and operated Wranglers Club, a topless bar off of Highway 80 West. Wranglers had been open for about three months before the accident on the night of July 13, 1990. Wranglers had a license to sell alcohol held in the name of I–Gotcha, Inc., and eighty-five to ninety percent of the club's revenues came from the sale of alcohol. The bar generated $30,000–50,000 per month in revenues.

The purpose of having topless entertainment at the club was to attract male customers into the club in order to sell liquor to them. Duncan acknowledged that one of the problems with having topless entertainment to attract male patrons was that the enter-tainment attracted males under twenty-one years of age in addition to patrons who were of legal drinking age. Duncan testified that serving underage drinkers was dangerous; one particular danger was that inexperienced drinkers who drove might lack the same judgment and experience "to know when to say when." Duncan realized that a danger in selling alcohol to underage kids who were going to be driving was that the kids would wreck the car and die. Duncan recognized the club had a responsibility not to let underage people into the club, not to serve underage patrons drinks if they got into the club, and not to serve repeated drinks when someone was already intoxicated.

Duncan testified that the serving employees at Wranglers had been to the Texas Alcoholic Beverage Commission's sanctioned school and that weekly staff meetings were held to go over problems at the club. During the start-up phase of a nightclub, the first 90–120 days, Duncan would be at the club more frequently because the personnel would be new and untrained. Duncan agreed that it was important to instruct employees to check for IDs and to "cut off" intoxicated people because if they were not so instructed, they might think it was not important. Duncan explained that he makes an effort to ensure the employees abide by all of his requirements and rules. Employees were told to "cut off" patrons who the employees believed to be intoxicated.

Duncan indicated Wranglers had certain policies and procedures in place setting out the job descriptions and general rules for the employees to carry out their duties. The club was set up so that each person had to pass by the door personnel who were responsible for quality control (insuring that prospective patrons were not already drunk and that they were dressed appropriately) and to make sure no one under twenty-one got into the club. The door personnel were to ask for ID when someone who looked like they might be under twenty-one tried to get into the club. Door personnel were trained to look for defects in identification and could refuse service to anyone who presented an out-of-state identification or who refused to produce identification. Duncan testified it would be

against industry standards to allow a person who appeared to be under twenty-one to get into the club without producing a valid Texas driver's license. Further, if the person appeared to be under twenty-one based on physical appearance and produced an out-of state driver's license indicating he was twenty-one, the club's policy was to make additional inquiry.

Duncan testified, based on viewing a picture of John, that John should not have been admitted to the club unless he produced a valid Texas driver's license showing him to be twenty-one, and it would be necessary for him to produce valid identification to be served. It was the serving personnel's responsibility to make sure the people being served were twenty-one years of age. The only acceptable identification was a valid Texas driver's license.

The waitresses were supposed to check IDs before serving patrons. Duncan paid his waitresses $2.55 per hour plus tips. Duncan admitted it was understood by the waitresses and the people who ran the nightclub that the larger the bill, the larger the tip was. In the employee rule book, the sections dealing with the waitresses' specific rules recognized that the more people they have to serve in their section and the more drinks they serve, the bigger their tips and total pay will be. The rule book also required servers to get a valid Texas driver's license before accepting a credit card to ensure the club would be paid. There were no instructions to get a valid Texas ID before serving patrons and no instructions on "cutting off" intoxicated patrons included in the rules for the waitresses. Duncan testified that the rules regarding IDs and "cutting off" patrons were only in the general rules and the Texas Alcoholic Beverage Commission certification. The instruction to check IDs was, however, included in the bartenders' specific rules.

Further, there were no rules in place at Wranglers limiting the number of drinks a person could be served. The bartenders and waitresses could serve as many drinks as were ordered as long as the patrons being served were not intoxicated in the opinion of the bartender or waitress. When asked whether it would be consistent with the bar's policies to serve five tequila shots within an hour, Duncan answered, "It's possible that it could be done, but by that time they ought to be cutting them off" because the person would be intoxicated if the shots were consumed within an hour and an hour and a half. The patron would be a "[d]amn good man if he [wasn't] drunk by then."

Regarding the proper procedure for dealing with intoxicated patrons, Duncan testified it was part of the job responsibilities of the manager, doormen, bartenders, and waitresses to observe the crowd and look for signs of intoxication. Duncan noted that some of the signs of intoxication the personnel would look for were slurred speech, staggering, and exceedingly boisterous behavior, possibly including loud talk or laughter. Duncan admitted it would be a deviation from the bar's standards for an employee or manager on duty who saw a patron who had had too much to drink not to attempt to arrange transportation home for the person or to give the individual sufficient time to sober up before leaving the club.

Prior to this incident, Wranglers had already had at least one problem with serving liquor to minors. Parichart Yordrum was a waitress at Wranglers. On May 5, 1990, Yordrum was arrested at Wranglers for the sale of an alcoholic beverage to a minor and charged with criminal negligence for failing to request and obtain any proof of age. Yordrum continued to work as a waitress serving patrons after the May 5 incident, and I–Gotcha hired a lawyer to defend Yordrum in the matter. Yordrum was still employed as a waitress on July 13, 1990. Although Wranglers kept a personnel file on each of its employees in which notes were made of deviations from the company rules in order to discourage the deviant conduct, no mention of the arrest appeared in Yordrum's file even though her actions were a violation of company rules according to Duncan. Yordrum's file did contain several complaints: 1) she was twenty-five minutes late for a shift; 2) she was caught drinking on the job; 3) she was late for work again; 4) she failed to show up for work; and 5) she was terminated sometime after the accident in question.

## THE APPEAL

The jury found that the sale of alcohol to John when he was under eighteen years of age constituted criminal negligence. The jury answered that the negligence of I–Gotcha and John was the proximate cause of John's death. The jury found fifty-one percent (51%) of the negligence attributable to I–Gotcha and forty-nine percent (49%) of the negligence attributable to John. The jury also found that the negligence of I–Gotcha and of Jeff was the proximate cause of Jeff's injuries and attributed fifty-one percent (51%) of the negligence to I–Gotcha and forty-nine percent (49%) of the negligence to Jeff. The jury found the conduct of Wranglers with regard to John and Jeff constituted gross negligence. The jury awarded Melissa McInnis and John McInnis, Sr., each individually, $100,000.00 in past damages and $125,000.00 in future damages arising from pecuniary loss, loss of companionship and society, and mental anguish. The jury awarded Jeff $30,000.00 for past and future physical pain and mental anguish, incapacity, disfigurement, physical impairment, and medical care. The jury also awarded $1,500,-000.00 in punitive damages for Wranglers' conduct toward John and awarded $100,-000.00 in punitive damages for Wranglers' conduct toward Jeff. With regard to appellant's affirmative defense, the jury found I–Gotcha did require its employees to attend a commission approved seller training program and that the employees actually attended such a program, but the jury did not find I–Gotcha had not directly or indirectly encouraged its employees to violate the law.

### SECTION 106.14(a)

■ Appellant argues in point of error one that the trial court erred in failing to grant defendant's motion for directed verdict because the evidence conclusively established that the defendant complied with the provisions of section 106.14(a) of the Texas Alcoholic Beverage Code. TEX.ALCO.BEV.CODE ANN. § 106.14(a) (Vernon 1995).[1] Because

both parties proceeded with the trial accepting and treating section 106.14(a) as an affirmative defense to civil liability and neither party has raised the issue of its applicability on appeal, we will presume for purposes of this appeal that the parties interpretation and use of section 106.14(a) is correct.

Section 106.14 provides:

(a) For purposes of this chapter and any other provision of this code relating to the sales, service, dispensing, or delivery of alcoholic beverages to a minor or an intoxicated person or the consumption of alcoholic beverages by a minor or an intoxicated person, the actions of an employee shall not be attributable to the employer if:

(1) the employer requires its employees to attend a commission-approved seller training program;

(2) the employee has actually attended such a training program; and

(3) the employer has not directly or indirectly encouraged the employee to violate such law.

*Id.*

Because the jury found that appellant met the burden of proving the first and second part of this provision, the issue before us on appeal is whether or not appellant put on sufficient evidence to prove as a matter of law that Wranglers did not directly or indirectly encourage its employees to violate the laws regarding the serving of minors and intoxicated persons.

■ Appellant sought a directed verdict under section 106.14(a). A directed verdict is proper only under limited circumstances: (1) a specifically indicated defect in the opponent's pleading makes it insufficient to support a judgment; (2) the evidence conclusively proves the movant is entitled to judgment as a matter of law; or (3) the evidence is legally insufficient to raise an issue of fact. *Texas Employers Ins. Ass'n v. Duree,* 798 S.W.2d 406, 408 (Tex.App.—Fort Worth 1990, writ denied) (op. on reh'g); *Rowland v.*

---

1. Duncan admitted that in order for the statutory defense to be an absolute defense for serving a minor, the minor must produce as identification a valid Texas driver's license or a Texas identification card from the Department of Motor Vehicles showing the person to be twenty-one years of age or older. Duncan conceded that a fake Arkansas drivers license or a novelty card would not bring the club within the protection.

*City of Corpus Christi,* 620 S.W.2d 930, 932–33 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.); *see also* TEX.R.CIV.P. 268. Appellant in this case asserts the evidence conclusively proved appellant was entitled to judgment as a matter of law.

■ Where an appellant is attacking the legal sufficiency of an adverse answer to a finding on which he had the burden of proof, the Texas Supreme Court has stated that the appellant must, as a matter of law, overcome two hurdles. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the fact finder's answer, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.; Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

We have no case law or legislative history to guide us regarding what evidence the legislature intended to be used to show direct or indirect encouragement of employees to violate the law. However, the Code Construction Act does direct us to presume that a just and reasonable result is intended and that the public interest is to be favored over private interest. TEX.GOV'T CODE ANN. § 311.021(3), (5) (Vernon 1988). Further, we are to consider the object the legislature was attempting to attain when construing a statute. TEX.GOV'T CODE ANN. § 311.023(1) (Vernon 1988).

■ It is in the public interest to discourage bar owners from profiting through breaking the law by serving alcohol to minors and obviously intoxicated minors. Further, in passing the Dram Shop Act, the Texas legislature intended to provide a statutory remedy where the negligence of a bar was found to be the proximate cause of an individual's injuries. TEX.ALCO.BEV.CODE ANN. § 2.02 (Vernon 1995). The testimony at trial from the owner of Wranglers showed that while he believed employees should be told to check IDs and to cut people off, he chose not to include these specific rules in the rule book outlining the duties of his waitresses. He did, however, see fit to include a rule making sure IDs were checked before accepting a credit card for payment. He did not set limits at the club on the number of shots a patron could be served. He did not provide written guidelines to ensure intoxicated patrons had alternate transportation or time to sober up. He received notice that there could be a problem with underage drinkers in the club when an employee of his, Yordrum, was arrested for selling liquor to a minor. He, however, did not take any steps to prevent the problem from happening again. He failed to do anything to tighten-up security or to stress the importance of following the law to his employees even though he recognized that the entertainment in his club, which was provided to attract male clientele to buy liquor (the primary source of the bar's revenue), would also attract underage, inexperienced drinkers who could be seriously harmed or killed, just as Jeff and John were.

We cannot say that there was no evidence in the record to support the jury's finding that appellant failed to prove that appellant did not directly or indirectly encourage its employees to violate the law. Appellant's first point of error is overruled.

### CRIMINAL NEGLIGENCE

■ In points of error ten and twelve, respectively, appellant claims the court erred in overruling appellant's objection to the submission of jury question one and in failing to grant a new trial. Appellant argues there was insufficient evidence to establish that I–Gotcha engaged in any activity giving rise to criminal negligence for question one to be submitted to the jury. Question one asked, "Was Wranglers' sale of alcohol to JOHN ALLEN MCINNIS, JR., when he was under eighteen years of age, criminal negligence?" Appellant challenges the submission of this question, relying on the following provision:

A person who sells a minor an alcoholic beverage does not commit an offense if the minor falsely represents himself to be 21 years old or older by displaying an apparently valid Texas driver's license or an identification card issued by the Texas Department of Public Safety, containing a

physical description consistent with his appearance for the purpose of inducing the person to sell him an alcoholic beverage. Tex.Alco.Bev.Code Ann. § 106.03(b) (Vernon 1995). Appellant's complaint is that there was insufficient evidence describing the contents of the fake IDs used by Jeff and Chad to deprive Wranglers of this protection. The question as submitted, however, did not ask if the sale to either Jeff or Chad constituted criminal negligence; the question asked whether the sale to John constituted criminal negligence, and there was no evidence admitted at trial indicating that John used or even possessed a fake ID. Appellant's tenth point of error is overruled.

Point of error twelve argues appellant's motion for new trial should have been granted because the evidence was insufficient to support the jury finding that the sale of alcohol to John when he was under eighteen years of age was criminal negligence. "A person commits an offense if with criminal negligence he sells an alcoholic beverage to a minor." Tex.Alco.Bev.Code Ann. § 106.03(a) (Vernon 1995). Appellant again relies on the provision that it is not an offense if the minor falsely represents his age to be twenty-one with an apparently valid Texas ID. *See* Tex.Alco.Bev.Code Ann. § 106.03(b) (Vernon 1995). Appellant asserts that appellee "introduced no evidence that the false identifications were not one of the referenced exceptions."

First, appellant's argument is inconsistent with the facts. The question referred to the sale of alcohol to John and the false IDs that were referred to at trial belonged to Jeff and Chad. No evidence was adduced that John used a fake ID to gain admittance to Wranglers. Furthermore, the coroner found only a valid Texas driver's license on John at the time of his death which showed him to be seventeen years old. Both Jeff and Chad testified that John entered the bar without showing any identification and was sold alcoholic beverages. This was sufficient evidence

to support the jury finding. Further, there was evidence from both Jeff and Chad that their IDs were not valid Texas IDs. Appellant's twelfth point of error is overruled.

### ACTUAL DAMAGES

In point of error thirteen, appellant claims there was no evidence and insufficient evidence establishing pecuniary loss to submit question five to the jury regarding the damages to be paid to John McInnis, Sr. and Melissa McInnis for the death of their son. Appellant argues that in an action brought by a parent as plaintiff for the death of a minor child, the measure of damages is the pecuniary value of the services the child would have rendered during his minority, less the expense that would have been incurred on the child's maintenance and education during that period.

■ Appellant's assertion of the measure of damages is incorrect. The Texas Supreme Court in *Sanchez v. Shindler*, 651 S.W.2d 249 (Tex.1983), specifically rejected the pecuniary loss rule as "an antiquated concept of the child as an economic asset." *Id.* at 251. As the court recognized, "The real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of love, advice, comfort, companionship and society." *Id.* A parent can recover damages for mental anguish[2] and for loss of companionship and society for the death of his or her child. *Id.*

■ Both John's mother and father testified at trial about their close relationship to their son John and how the family has missed his love and companionship. Considering the evidence and inferences that tend to support the finding and disregarding all the evidence and inferences to the contrary, we find there is more than a scintilla of evidence to support the damage award. *See Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993). Further, looking at all of the evidence presented, we cannot say that

2. In point of error two, appellant argues there was no evidence to support the finding the appellant acted with the mental state necessary to award punitive damages or *mental anguish* because the appellant abided by the provisions of section 106.14(a) of the Texas Alcohol Beverage

Code. As appellant's brief only argued about punitive damages under that point of error and never provided an argument as to how section 106.14(a) would affect the award of mental anguish damages, appellant waived any error with regard to the award of mental anguish damages.

the evidence supporting the findings is so weak or the evidence to the contrary so overwhelming that the answer should be set aside. *See Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965). Appellant's thirteenth point of error is overruled.

## PUNITIVE DAMAGES

### Section 106.14(a)

In point of error two, appellant argues there was no evidence to support the finding Wranglers acted with the mental state necessary to award punitive damages because the appellant complied with the provisions of section 106.14(a) of the Texas Alcohol Beverage Code. The jury, however, was unconvinced that appellant had not directly or indirectly encouraged its employees to break the law as required by section 106.14(a)(3). As we concluded in point of error one, we cannot say as a matter of law that appellant complied with the provision.

Appellant's second point of error is overruled as it applies to the application of section 106.14(a). The issue of evidence supporting the necessary mental state is addressed in subsequent points of error.

### Section 41.007

■ In point of error six, appellant claims the award of $1,500,000.00 in punitive damages for the actions toward John was excessive as a matter of law under section 41.007 of the Texas Civil Practice and Remedies code. TEX.CIV.PRAC. & REM.CODE ANN. § 41.007 (Vernon Supp.1995). Section 41.007 provides that punitive damages "may not exceed four times the amount of actual damages or $200,000, whichever is greater." *Id.* The jury awarded John McInnis, Sr. and Melissa McInnis $450,000.00 in actual damages. The award of $1,500,000.00 in punitive damages for Wranglers' actions toward John does not exceed four times the amount of actual damages; rather, appellant argues the four times greater ratio should have been applied to the jury award *after* the award was reduced to figure in the comparative negligence percentages. Appellant, however, has provided us with no caselaw supporting the contention that actual damages as indicated in the statute really means actual damages reduced in the judgment by comparative negligence findings.

■ Looking first at comparative responsibility, section 33.002 of the Texas Civil Practice and Remedies Code provides that the chapter governing comparative responsibility "does not apply to a claim based on an intentional tort or a claim for [punitive] damages included in an action to which this chapter otherwise applies." TEX.CIV.PRAC. & REM.CODE ANN. § 33.002(a) (Vernon Supp. 1995). Therefore, while comparative responsibility does apply to claims under the Dram Shop Act, *see Smith v. Sewell,* 858 S.W.2d 350 (Tex.1993), it specifically does not apply to a claim for punitive damages. Therefore, it is clear that the amount of punitive damages does not have to be reduced by the percentage responsibility the jury attributed to the injured party. *See Hondo's Truck Stop Cafe, Inc. v. Clemmons,* 716 S.W.2d 725, 725 (Tex.App.—Corpus Christi 1986, no writ); *Olin Corp. v. Dyson,* 709 S.W.2d 251, 253–54 (Tex.App.—Houston [14th Dist.] 1986, no writ); *Anderson v. Trent,* 685 S.W.2d 712, 714 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). The opinions addressing the issue explain that punitive damages are not reduced because the main purpose of punitive damages is to punish the grossly negligent defendant in the interest of public policy rather than to compensate the individual plaintiff.

■ Turning to appellant's specific complaint regarding the meaning of "actual damages" as used in the statutory cap, the punitive damages cap is used to help insure that punitive damages assessed are reasonably related to damages suffered. Following the reasoning of the cases which do not apply contributory negligence percentages to reduce punitive damages, we believe the public policy interests of using punitive damages as punishment rather than as compensation for the plaintiff are best served by having the punitive damages related to the total amount of harm that occurred as reflected by the damages awarded by the jury.

In addition, several cases have offered guidance as to what should and should not be included in calculating the cap. In *Wheel-*

*ways Insurance Company v. Hodges,* 872 S.W.2d 776 (Tex.App.—Texarkana 1994, no writ), plaintiff Hodges brought a suit based on a car accident with Harvey, who was driving a Capps rental car rented by Harvey's friend Davis. Wheelways was Capps' insurer. Hodges eventually sued Wheelways for breach of contract, breach of the duty of good faith and fair dealing, negligence, DTPA, and insurance code violations. Hodges suit, in part, was as assignee for Harvey. Hodges won on the negligence, DTPA, and insurance code theories. She received $200,-000.00 for her mental anguish and received punitive damages individually and as assignee. The court of appeals determined that Hodges could not recover mental anguish under the theories as pled. *Id.* at 782. The court held that the punitive damages had to fail because the actual damages failed. *Id.* at 783.

The court did, however, go on to discuss punitive damages. *Id.* at 783 n. 8. The appellate court noted that the trial court included prejudgment interest in the amount of actual damages on which the punitive damages cap was calculated. *Id.* Texas law, however, provides that prejudgment interest may not be assessed or recovered on an award of punitive damages. *Id.* (citing Tex. Civ.Prac. & Rem.Code Ann. § 41.006 (Vernon Supp.1994)). The appellate court reasoned that using prejudgment interest in the actual damages amount for purposes of determining the cap yielded "the same result forbidden by the supreme court when it said prejudgment interest could not be awarded on punitive damages." *Id.* at 783 n. 8. By analogy, if section 33.002 of the Texas Civil Practice and Remedies Code prohibits using contributory negligence to reduce punitive damages, but the trial court is required to reduce actual damages by the contributory negligence percentages before calculating the punitive damages cap, the statute would be circumvented.

In *Beverly Enterprises v. Leath,* the Waco Court of Appeals addressed the basis for calculating the punitive damages cap. *Beverly Enterprises v. Leath,* 829 S.W.2d 382 (Tex. App.—Waco 1992, no writ). In *Beverly Enterprises,* the appellate court noted that Leath was awarded by the jury a total of

$158,366.16 in actual damages for past and future medical care, loss of earnings, physical pain and mental anguish, and physical impairment. *Id.* at 387–88. The judgment, however, only awarded $100,927.70 because there were offsets for amounts that had been paid to Leath on her behalf before trial. *Id.* at 388. Leath received $500,000.00 in punitive damages. *Id.* at 387.

On appeal, appellant argued that the punitive damages cap should have been calculated on the $100,927.70 amount rather than the $158,366.16 and that the $500,000.00 punitive damages award violated the statutory provision because it was in excess of four times the actual damages. *Id.* at 388. The appellate court explained that the term "actual damages" as used in section 41.007 "refers to the total amount of damages found by the jury." *Id.* The court held that pretrial payments do not reduce the amount of "actual damages" suffered by an injured party; rather, "they simply reduce the amount of damages which are recoverable by that party after a trial." *Id.*

We find that "actual damages" as used in the punitive damages cap refers to the damages findings as returned by the jury prior to reduction for contributory negligence findings. Appellant's sixth point of error is overruled.

*Gross Negligence*

Appellant claims there was no evidence and insufficient evidence to support the finding of gross negligence in points of error three and eleven, respectively. In point of error nine, appellant contends there was no evidence or insufficient evidence to support the jury's finding that appellant acted with heedless and reckless disregard. However, there was no jury question asked as to whether appellant acted with heedless and reckless disregard. Appellant's ninth point of error appears to reiterate points of error three and eleven regarding the finding on gross negligence, and all three points will be considered together as challenging the legal and factual sufficiency of the evidence.

"Gross negligence" means more than momentary thoughtlessness, inadver-

tence or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected. TEX.CIV. PRAC. & REM.CODE ANN. § 41.001(5) (Vernon Supp.1995). The evidence must establish the defendant's actual conscious indifference; merely raising the belief that conscious indifference might be attributable to a hypothetical reasonable defendant is insufficient. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 20 (Tex.1994). "Entire want of care" does not mean that evidence of "some care" automatically precludes a finding of gross negligence; rather, " 'entire want of care' must be 'understood in the context of the whole [definition]' " of gross negligence. *Id.* (quoting *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex.1981)) (alteration in original). Thus, reviewing courts are instructed to look for evidence of the defendant's subjective mental state rather than the exercise of care because what lifts ordinary negligence into gross negligence is the defendant's mental attitude. *Id.* (citing *Burk Royalty Co.*, 616 S.W.2d at 922).

The definition of gross negligence involves two distinct components: 1) an act or omission by the defendant; and 2) the mental state of the defendant. *Id.* at 21. The first part, the act or omission, must "involve behavior that endangers the rights, safety, or welfare of the person affected." *Id.* Objectively, the defendant's conduct must involve an act or omission that created an extreme danger of risk. *Id.* at 21–22. "Extreme risk is a function of both the magnitude and the probability of the anticipated injury to the plaintiff." *Id.* at 22. To support a gross negligence finding, the act or omission must be unjustifiable and likely to cause serious harm. *Id.* at 22. The second part, the mental state, requires a showing that the defendant was subjectively aware of the extreme risk created. *Id.* at 22. This subjective mental state may, however, be proven by either direct or circumstantial evidence. *Id.* at 23. Thus, gross negligence differs from ordinary negligence in that the defendant must be "consciously indifferent" and the act or omission must create an extreme danger or risk. *Id.* at 21.

In determining a "no evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992). " 'The evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference [that the jury must reach].' " *Moriel*, 879 S.W.2d at 24 (quoting *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 600 (Tex.1993)) (alteration in original). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *Browning–Ferris, Inc.*, 865 S.W.2d at 928. A "no evidence" point of error may only be sustained when the record discloses one of the following: 1) a complete absence of evidence of a vital fact; 2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; 3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or 4) the evidence establishes conclusively the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.*, 793 S.W.2d 660, 666 n. 9 (Tex. 1990); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX.L.REV. 361 (1960). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992). Under *Moriel*, our opinion must detail the evidence whether we affirm or reverse the punitive damage award. *Moriel*, 879 S.W.2d at 31.

We begin by reviewing the record in the light most favorable to the verdict for objective evidence that the appellant's conduct involved an act or omission that created an extreme danger of risk in light of the magnitude and probability of the anticipated injury. The jury found appellant negligent in allowing a seventeen-year-old boy to enter a topless bar without an ID, serving the boy without requiring an ID, failing to "cut him

off" when he was obviously intoxicated, and permitting him to leave the club without providing a safe means of transportation. At trial, Jeff and Chad both testified to the facts surrounding their trip to Wranglers as described previously in this opinion. Duncan himself testified that he was aware of the danger of having topless entertainment attracting underage patrons who were inexperienced drinkers and might be involved in a drunken driving accident. He also testified it was the club's responsibility not to allow entrance or service to underage patrons and not to allow repeated service to intoxicated patrons. Duncan even testified, based on a photo of John, that John should not have been allowed in without a valid Texas ID. Further, Duncan testified if John drank what Chad and Jeff testified he drank, he would be a "[d]amn good man if he [wasn't] drunk by then." We conclude there was evidence of an omission in failing to check John's ID for entrance and service and an act of repeatedly serving someone who was intoxicated that were unjustifiable and likely to cause serious harm. *See id.* at 22.

■ Next, we review the record in the light most favorable to the verdict for evidence of appellant's subjective awareness of the extreme risk created. This evidence may be either direct or circumstantial. *See id.* at 23. Appellant argues there could be no finding of gross negligence because Wranglers required its serving staff to attend a Texas Alcoholic Beverage Commission seller training program and addressed issues involving alcohol at weekly staff meetings. A showing of "some care" will not, however, preclude a finding of gross negligence where there is evidence the defendant's mental attitude of conscious indifference. *Id.* at 22.

Again, looking at the evidence in the light most favorable to the verdict, the jury could have determined that although Wranglers sent its employees to the training session, Wranglers' real concern was with the bottom line—alcohol revenues. The jury saw the employee job manuals which never required the waitresses to get IDs before serving alcohol, but did require them to get IDs before accepting a credit card as payment. The employees only guidance on "cutting someone off" was when the patrons were drunk in the server's opinion. There were no instructions in the rule book. Duncan himself admitted it was important to instruct employees on such issues or else they might not think the issues were important. Overall, what the jurors heard was that while Wranglers sent its employees to a training program, the bar had a reputation for being an easy place for minors to get in and be served alcohol, three minors gained entrance without proper IDs (or even good "fakes"), ran into other underage drinkers, were served repeated drinks without being asked for identification, were never "cut off" even when they had been served an amount that the bar owner agreed would make a person intoxicated, and were not questioned about nor offered a safe ride home. While the employees may have been sent to training, the evidence presented showed that both the door, serving, and floor staff all shirked their "duties" of screening patrons, serving patrons, and observing patrons to determine when to cut them off.

Further, the jury heard that when an employee of the club was arrested for serving alcohol to a minor, no actions were taken to tighten security and the alleged violation of company policy was not even noted on her personnel record. This was some evidence from which the jury could find a "conscious indifference" to an extreme risk of harm.

Appellants third point of error is overruled.

■ Looking at appellant's eleventh point of error, an assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza,* 395 S.W.2d at 823. In a review of the basis supporting an award of punitive damages, a court of appeals must detail the evidence in the opinion "and [explain] why that evidence either supports or does not support the punitive damages award in light of the *Kraus* factors." *Moriel,* 879 S.W.2d at 31 (referring to *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981)). The *Kraus* factors include: 1) the nature of the wrong; 2) the character

of the conduct involved; 3) the degree of culpability of the wrongdoer; 4) the situation and sensibilities of the parties concerned; and 5) the extent to which such conduct offends a public sense of justice and propriety. *Kraus,* 616 S.W.2d at 910.

Looking at the *Kraus* factors, the evidence is sufficient to support the jury's punitive damages award. The nature of the wrong in this case, allowing underage drinkers into a topless bar, allowing them to drink up to five beers and four tequila shots in about an hour and a half, and letting them leave without making sure they had a ride or could drive, was not only disturbing in the degree of negligence, it was also against the law of the State of Texas. The character of the conduct shows that this was not one employee disobeying the rules; rather, it shows every level of employee from the door staff to the floor staff failed to perform their "duties" as the bar owner explained the duties to be. Further, it was not the first time an underage patron had been served as indicated by Ms. Yordrum's arrest and the bar's reputation of being an easy place for minors to buy alcohol. While the jury did find the boys were forty-nine percent (49%) to blame for the accident that occurred following the drinking binge, the jury found Wranglers was more to blame. Looking at the situation and sensibilities of the parties concerned, this type of accident was a known and recognized danger of running this sort of establishment as the owner of the bar indicated during trial. The owner also indicated that it was the bar's responsibility to keep this type of situation from happening by: 1) carding patrons as they entered the bar; 2) carding patrons before serving them; and 3) cutting patrons off when they were already intoxicated. Finally, this type of conduct, violating state law to serve minors and make a profit, does offend a public sense of justice and propriety. Accordingly, appellant's ninth and eleventh points of error are overruled.

In points of error four and five, appellant argues the trial court erred in failing to grant defendant's motion for new trial on grounds that the award of $1,500,000.00 to the McInnis family and $100,000.00 to Jeff Elder in punitive damages was manifestly unjust as it was against the great weight and preponderance of the evidence. An appellate court cannot vacate a damage award unless the verdict is " 'so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust.' " *Moriel,* 879 S.W.2d at 30 (quoting *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986)). As discussed under the preceding points of error, there was sufficient evidence to support the award of punitive damages. Appellant's fourth and fifth points of error are overruled.

### Due Process

In points of error seven and eight, appellant claims the award of punitive damages violates the due process clause of the United States Constitution and the Texas Constitution. In point of error seven, appellant contends the *amount* of the award, $1,500,000.00, violates the due process provisions because it is not reasonably proportional to actual damages under *Pacific Mutual Life Insurance Company v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The Texas Legislature, however, has seen fit to limit the amount of punitive damages by setting caps limiting an award of punitive damages to four times the amount of actual damages. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 41.007 (Vernon Supp.1995). Here, the punitive damages were within the amount authorized by the statute, and the ratio is not so great as to render it excessive in light of the facts of the case. *See Beverly Enter.,* 829 S.W.2d at 386. We overrule point of error seven.

In point of error eight, appellant argues the procedure used in reviewing punitive damage awards violates due process protections. Appellant claims that because there is no requirement for the trial court to hold a hearing or even rule on the motion for new trial when there is a complaint of excessive punitive damages, due process rights are violated. Further, appellant claims that there is insufficient due process protection on appeal because Texas courts of appeals are not required to detail their reasoning if they plan to affirm a punitive damage award as they are required to do if they are reversing a punitive damage award.

Appellant fails, however, to cite to *Moriel,* the decision in which the Texas Supreme Court addressed both of these issues. In *Moriel,* the Texas Supreme Court considered the situation of Texas trial courts, which are not required to articulate their reasons for upholding punitive damage awards or to affirmatively act on post-trial objections to a punitive damage award. *Moriel,* 879 S.W.2d at 32. The court determined that while requiring trial courts to make specific findings on post-verdict review of punitive damage awards would facilitate appellate review, it declined to require such findings in light of the heavy burdens on understaffed trial courts. *Id.* at 33. The Texas Supreme Court did, however, encourage trial judges to make such findings to the extent practicable.[3] *Id.*

With regard to appellant's assertion that appellate courts are not required to detail findings when affirming an award of punitive damages, the *Moriel* decision clearly states that appellate courts reviewing punitive damage awards should detail the evidence in their opinions and explain why the jury's finding is or is not supported by the evidence when affirming or reversing a punitive damage award. *Id.* at 31. Because this court has provided a detailed factual sufficiency review of the punitive damage award, appellant's claim in its eighth point of error that its due process rights were violated by the review procedures is overruled.

The judgment of the trial court is affirmed.

---

**3.** Appellant does not raise a due process claim based on the lack of bifurcation of liability and the award of punitive damages.