

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00510-CV

---

HITESH B. YAGNIK, M.D.                                    APPELLANT

V.

MARCUS HERNANDEZ AND                                     APPELLEES
DIANE HERNANDEZ

----------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Hitesh B. Yagnik, M.D. appeals from the trial court's judgment in favor of Appellees Marcus Hernandez and Diane Hernandez. Yagnik brings four issues challenging the trial court's denial of his motion for directed verdict and motion for new trial. Because we hold that Yagnik failed to preserve his

---

[1]*See* Tex. R. App. P. 47.4.

complaint about the denial of his directed verdict and that the trial court did not err by denying his motion for new trial, we affirm.

## Background

The Hernandezes sued Yagnik and Columbia Medical Center of Arlington Subsidiary, L.P. (d/b/a Medical Center of Arlington) (MCA) for the death of their son Marcus Hernandez Jr. MCA settled with the Hernandezes prior to trial.

At the close of the Hernandezes' case, Yagnik moved for a direct verdict on the ground that the evidence established as a matter of law that Junior's death was caused by the negligence of MCA nurses. The trial court denied the motion, and Yagnik proceeded with his defense. At the close of evidence, the trial court asked if Yagnik wished to re-urge his motion; Yagnik's attorney stated that he was not reurging it.

In a 10-2 verdict, the jury found that Junior's death had been caused by Yagnik's negligence. The jury awarded $300,000 for pain and mental anguish; $185,000 to each parent for past loss of companionship and society; $356,000 to each parent for future loss of companionship and society; $331,000 to each parent for past mental anguish; and $317,500 to each parent for future mental anguish.

On October 27, 2011, the trial court signed a judgment on the jury's verdict. After giving Yagnik credit for the settlement with MCA and applying statutory caps on medical negligence damages, the trial court awarded the Hernandezes damages of $1,818,601.63.

Yagnik filed a motion for new trial. In the motion, Yagnik asserted that the trial court incorrectly denied his motion for directed verdict because "the only legally sufficient evidence" established MCA's negligence. He also asserted that jurors committed juror misconduct by improperly determining damages by way of a quotient verdict.

Yagnik attached to his motion the affidavits of two jurors, both stating that before the jury answered the damages issues, the ten jurors who found negligence all agreed in advance to use the average of the jurors' damages determinations to answer each of the damages questions. One of the affidavits was from dissenting juror Shelby Matlock, and the other was from juror Tammy McKee, one of the ten jurors who found negligence.

In response, the Hernandezes asserted that the jurors' affidavits could not be considered because they concerned matters occurring during jury deliberations. In the event that the trial court considered the affidavits, however, the Hernandezes included affidavits of their own from eight of the jurors, including McKee.

In McKee's second affidavit, she stated that although her previous affidavit included language that the jurors had agreed in advance to use an average, it was not true that the jurors had agreed to be bound by the average amount before it was even calculated or known. She stated that when the jurors began considering the damages question, "[n]one of the amounts suggested by the 10 jurors were the same." To help speed up the process, one of the jurors proposed

3

using the average of the jurors' suggestions as a starting point to reaching an agreement. Once the averages were calculated, each of the ten jurors voted to approve each of the amounts included in the verdict. The affidavits from seven other jurors all stated that the jurors did not have an advance agreement to use averages to answer the damage questions and that each juror could still have disagreed with the final dollar amounts once the averages were determined.

The trial court signed an order overruling Yagnik's new trial motion on November 22, 2011. The next day, Yagnik filed a second motion for new trial. This motion asked for a suggestion of remittitur and also asserted that the jury's findings that he breached the standard of care and that his conduct proximately caused Junior's injuries were not supported by factually sufficient evidence, were against the great weight and preponderance of the evidence, and were supported by evidence so weak that they were clearly wrong and manifestly unjust. He also asserted that the damages findings were not supported by legally or factually sufficient evidence and were excessive.

On the same day, Yagnik also filed a motion for judgment notwithstanding the verdict. He argued that the evidence was legally insufficient to support the jury's findings on negligence and damages. The trial court did not rule on the motions, which were overruled by operation of law. Yagnik now appeals.

4

**Analysis**

*Motion for New Trial*

In Yagnik's first issue, he argues that the trial court erred by refusing to conduct a hearing, refusing to consider juror testimony, and denying his motion for new trial. Yagnik bases much of his argument on two civil procedure rules: rule 226a and rule 327.[2]

Rule 327(a) states that "[w]hen the ground of a motion for new trial, supported by affidavit, is misconduct of the jury . . . the court shall hear evidence thereof from the jury or others in open court."[3] Rule 327(a) does not stand alone, however. Subsection (b) of that rule states that a juror may not give an affidavit or testimony "as to any matter or statement occurring during the course of the jury's deliberations."[4] The only exception provided in that rule allows for a juror to testify about "whether any outside influence was improperly brought to bear upon any juror."[5]

The Supreme Court of Texas has held that this rule means exactly what it says: it prohibits jurors from testifying about matters and statements occurring

---

[2]Tex. R. Civ. P. 226a, 327.

[3]Tex. R. Civ. P. 327.

[4]*Id.*

[5]*Id.*

5

during deliberations.[6]  In *Golden Eagle*, the Supreme Court stated clearly that "[r]ule 327(b) operates to prohibit jurors from testifying about matters and statements occurring during deliberations" and "applies *regardless of the grounds* alleged for a new trial."[7]

The Supreme Court has also noted that rule 327 does not apply to non-jurors, and therefore when the evidence of misconduct comes from a source other than a juror, the affidavit is not limited to alleging outside influences.[8]  Thus, although juror misconduct is a ground for new trial, proof of that misconduct must come from a source other than the testimony of a juror about deliberations.[9]  The affidavits submitted by Yagnik were from jurors, and therefore rule 327 applies.

Yagnik argues that the affidavits do not violate the rule against testifying about what happened during "deliberations" as that term is used in the law because if the jurors used a quotient verdict, then they did not weigh the evidence and therefore did not deliberate.[10]  We disagree.  In *Golden Eagle*, the Supreme Court considered whether the trial court could hear testimony about an

---

[6]*Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 370 (Tex. 2000).

[7]*Id.* (emphasis added).

[8]*Id.* at 369.

[9]*See id.* at 371.

[10]*See id.* (stating that "[t]he Texas Rules of Civil Procedure use the term 'deliberations' as meaning formal jury deliberations—when the jury weighs the evidence to arrive at a verdict").

6

agreement between jurors to trade answers that occurred during the time that the jurors were supposed to be engaged in formal deliberations.[11] The Supreme Court held that this testimony was testimony about something that occurred during deliberations and was therefore prohibited by rule 327.[12]

We see no meaningful distinction between trading answers and agreeing to a quotient verdict in considering whether something did not occur during deliberations because in either case, although the jurors had been sent to deliberate, they were not at the time actually weighing the evidence. And under any of the definitions of "deliberations" accepted by the Supreme Court in *Golden Eagle*, the jurors here were in deliberations at the time they allegedly agreed to use a quotient verdict.[13] This discussion was during the time for formal deliberations. The jurors were not on a break.[14] The jurors had been sent out to weigh the evidence and arrive at a verdict. This discussion occurred during that stage. It stands to reason that if the jurors' discussion during the time in which the jury is supposed to be considering evidence and arriving at a verdict stops being "deliberations" whenever juror misconduct occurs, then jurors could always

---

[11]*Id.* at 370.

[12]*Id.*

[13]*See id.* at 371–72.

[14]*Cf. id.* at 371.

7

testify about misconduct. That is clearly not the law. Accordingly, we hold that the affidavits submitted by Yagnik were testimony about juror deliberations.

The only affidavits submitted by Yagnik were the affidavits of two jurors concerning the jury's deliberations. The trial court could not consider these affidavits. Accordingly, rule 327 did not required the trial court to hold a hearing because Yagnik did not support the ground of his motion—juror misconduct—with affidavits that the trial court could consider.[15]

Yagnik argues that *Golden Eagle* does not control our decision in this case. He bases this argument on the Supreme Court's 2011 approval of juror instructions under rule 226a, which inform jurors that "[y]ou may be called into court to testify about any violations of these instructions."[16] He notes that rule 226a instructions state that the failure to abide by the prohibition on a quotient verdict is jury misconduct.[17] He then argues that by approving this language, the Supreme Court reaffirmed that the trial court could receive testimony from jurors regarding misconduct, which would include the use of quotient verdicts, and that in light of rule 226a, evidence on the violation of the court's instruction must be

---

[15] *See WPS, Inc. v. Enervest Operating, L.L.C.*, No. 01-06-00759-CV, 2010 WL 2244077 at *17 (Tex. App.—Houston [1st Dist.] May 28, 2010, pet. denied) (mem. op.) (op. on rehearing) ("The affidavits were patently inadmissible. . . . Without the affidavits, WPS had no evidence to support this new-trial ground.").

[16] Tex. R. Civ. P. 226a; Supreme Court of Texas, Amendments to Texas Rules of Civil Procedure 281 and 284 and to the Jury Instructions Under Texas Rule of Civil Procedure 226A, Docket No. 11–9047, 4 (Mar. 15, 2011).

[17] *See* Rule 226A Amendments, at 10.

8

admissible under rule 327(a).  He further argues that because this language was adopted after and is more specific than rule 327, to the extent that rules 327 and 226a conflict, rule 226a controls.[18]

We find this line of argument unpersuasive.  Given the discussion by the Supreme Court of the policy considerations behind prohibiting juror testimony about deliberations,[19] if the court had wanted to overturn its prior holdings and interpretation of rule 327, it would have done so explicitly.  We do not believe that by approving this sentence of juror instructions, the Supreme Court intended to overrule its own precedent.

On the subject of policy considerations, we will briefly discuss those at issue in cases such as this one.  In *Columbia Medical Center*, the Supreme Court overruled years of Texas precedent by holding that a trial court must give some explanation of the basis for its decision when it grants a motion for new trial.[20] The court concluded that merely stating that the grant of a new trial was "in the interest of justice" was not sufficient because

> such a vague explanation in setting aside a jury verdict does not enhance respect for the judiciary or the rule of law, detracts from transparency we strive to achieve in our legal system, and does not

---

[18]*See* Tex. Gov't Code Ann. § 311.025 (West 2013).

[19]*Golden Eagle*, 24 S.W.3d at 367; *see also Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 666 (Tex. 2009).

[20]*In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 213 (Tex. 2009).

9

sufficiently respect the reasonable expectations of parties and the public when a lawsuit is tried to a jury.[21]

While it would seem that prohibiting a trial court from hearing or considering evidence of juror misconduct raises these same concerns, the Supreme Court has not yet applied these policy considerations to circumstances such as those involved in this case. Instead, that court has applied different policy considerations to this type of situation, including "(1) keeping jury deliberations private to encourage candid discussion of a case, (2) protecting jurors from post-trial harassment or tampering, (3) preventing a disgruntled juror whose view did not prevail from overturning the verdict, and (4) protecting the need for finality."[22] We are accordingly compelled to hold that the trial court did not abuse its discretion by refusing to consider the juror affidavits.

Finally under this issue, Yagnik argues that the denial of his motion for new trial denies his constitutional rights to a fair and impartial trial and to due process. The Supreme Court has considered these arguments and rejected them.[23] We find Yagnik's attempts to distinguish *Golden Eagle* unpersuasive, and, accordingly, we overrule his first issue.

---

[21] *Id.*

[22] *Ford Motor Co.*, 279 S.W.3d at 666.

[23] *Golden Eagle*, 24 S.W.3d at 375 ("We conclude that Rules 327(b) and 606(b) do not deprive the litigants of a fair trial under the Texas Constitution, nor do they fail to afford litigants due process.").

10

*Sufficiency of the Evidence*

In Yagnik's second issue, he asserts that the trial court erred by denying his directed verdict as to the liability of MCA. He contends that the Hernandezes' expert conclusively established MCA's liability based on nursing negligence, and, therefore, the jury should have been instructed to answer "yes" as to MCA's liability in question one of the charge. Yagnik did not reurge his motion for directed verdict at the close of all evidence, and he therefore waived any complaint that the trial court erred by denying his directed verdict.[24] We will consider his issue, however, to the extent that he challenges the legal sufficiency of the evidence on this question generally. As the party seeking a jury finding that MCA was negligent, Yagnik had the burden to introduce sufficient evidence

---

[24] *See 1986 Dodge 150 Pickup Vin No. 1B7FD14T1GS006316 v. State*, 129 S.W.3d 180, 183 (Tex. App.—Texarkana 2004, no pet.); *see also Cliffs Drilling Co. v. Burrows*, 930 S.W.2d 709, 712 (Tex. App.—Houston [1st Dist.] 1996, no writ); *McMeens v. Pease*, 878 S.W.2d 185, 190 (Tex. App.—Corpus Christi 1994, writ denied); *Bryan v. Dockery*, 788 S.W.2d 447, 449 (Tex. App.—Houston [1st Dist.] 1990, no writ).

to establish its liability,[25] and we therefore review the record to determine whether he established MCA's liability as a matter of law.[26]

Yagnik points to no testimony that any action of the nurses proximately caused Junior's death. Rather, he points to omissions—acts that the nurses should have taken but did not—that he claims proximately caused Junior's death. In support of his argument that the nurses' negligence was established as a matter of law, Yagnik relies on the testimony of Dr. Howard Parness, the expert who testified for the Hernandezes.

Yagnik points out that Parness testified that the nurses should have asked Yagnik to come to Junior's bedside, should have told Yagnik that there was a delay in getting blood for Junior, should have informed supervisors that they were short-staffed and therefore could not adequately care for Junior, and should have taken Junior's vital signs more frequently. But Parness also testified that Yagnik had "plenty of opportunity and information from the nurses to warrant him seeing the patient" and that he "[didn't] know what would have made him come and see the patient." Regarding the delay in obtaining blood, Parness expressly

---

[25] *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a)(3) (West 2008) ("The trier of fact . . . shall determine the percentage of responsibility . . . for . . . each settling person."); § 33.003(b) ("This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission."); *see also Utts v. Short*, 81 S.W.3d 822, 828 (Tex. 2002) ("A defendant seeking a settlement credit has the burden to prove its right to such a credit.").

[26] *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

disagreed when asked if his opinion was that notifying Yagnik that it was taking too long to get blood for Junior would have resulted in the appropriate steps being taken, thereby preventing Junior's death. And Parness did not testify about how the lack of staff proximately caused Junior's death or even that it did so.[27]

Yagnik asserts that Parness testified that Yagnik would have gone to Junior's bedside if the nurses told him that they thought he should. But what Parness actually said was, "I would assume. I don't have any evidence to the contrary." This statement is not sufficient to conclude as a matter of law that Yagnik would have gone to Junior's bedside if asked and would have then rendered the medical treatment necessary to prevent Junior's death. It is therefore also not sufficient to show as a matter of law that the nurses' failure to do so was a proximate cause of Junior's death.

Furthermore, Parness also testified that a nurse does not have to ask a doctor to come see a patient for the doctor to do so and that it is not within the standard of care for a doctor to only come see a patient after a nurse asks him to do so. He then stated that based on the information in Junior's chart that was related to Yagnik, the nurses gave Yagnik adequate information for a reasonably prudent doctor "to be spurred to go to the patient and examine him at bedside."

---

[27] *See Shelton v. Sargent*, 144 S.W.3d 113, 126 (Tex. App.—Fort Worth 2004, pet. denied) (establishing causation in a medical malpractice claim requires "showing a causal connection between the negligent act and the injury based on 'reasonable medical probability.'").

And although Parness stated that the failure to take orthostatic vital signs more frequently was a proximate cause of Junior's death, he did not testify how that failure was a proximate cause.[28]

This testimony falls short of establishing the nurses' negligence as a matter of law, especially in light of Parness's earlier testimony that Yagnik had been given plenty of information to warrant seeing Junior and that, given that fact, he did not know what would have made Yagnik decide to see Junior. Parness's testimony did not establish as a matter of law that the failure of the nurses to report more information to Yagnik or to ask Yagnik to come to Junior's bedside caused Yagnik not to administer lifesaving treatment to Junior and thus did not establish as a matter of law that these omissions by the nurses proximately caused Junior's death. We overrule Yagnik's second issue.

In Yagnik's third issue, he argues that the jury's answer to question one with respect to MCA's liability is contrary to the overwhelming weight and preponderance of the evidence. When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the

---

[28] *See id.*

answer should be set aside and a new trial ordered.[29]  When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact.[30]  The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony.[31]

Yagnik points to no additional evidence beyond that relied on in his legal sufficiency argument showing the negligence of the nurses, and we have found none.  Accordingly, we cannot say that the jury's finding was so contrary to the overwhelming weight of all the evidence or that the credible evidence supporting the finding is so weak that a new trial should be ordered.  We overrule Yagnik's third issue.

In Yagnik's fourth and final issue, he argues that the damages awards to Marcus are excessive and not supported by factually sufficient evidence.  He contends that the evidence "does not show a substantial disruption in daily routine or a high degree of mental pain and distress" and "falls far short of showing the type of relationship required to sustain the loss of companionship damages."

---

[29] *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

[30] *Golden Eagle*, 116 S.W.3d at 761.

[31] *Id.*

Texas law allows a parent to recover damages for the loss of companionship and society for the death of his or her child.[32] As the Supreme Court of Texas has said, "The real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of love, advice, comfort, companionship[,] and society."[33]

A parent may also recover for mental anguish due to the loss of a child.[34] The presence or absence of mental pain is an inherently subjective question, and the process of awarding damages for an amorphous injury such as mental anguish is inherently difficult and is not readily susceptible to objective analysis.[35] Because there are no objective guidelines for assessing monetary damages for mental anguish, the jury has discretion in awarding an amount of damages it determines appropriate.[36]

Marcus testified that when Junior did not live at home, he came by every week to visit. Whenever he could, Marcus would take him fishing or work on cars with him. Marcus wanted to spend "a lot of time" with Junior, although that was

---

[32] *Sanchez v. Schindler*, 651 S.W.2d 249, 251 (Tex. 1983); *I-Gotcha, Inc. v. McInnis*, 903 S.W.2d 829, 839 (Tex. App.—Fort Worth 1995, writ denied).

[33] *Sanchez*, 651 S.W.2d at 251.

[34] *I-Gotcha*, 903 S.W.2d at 839.

[35] *Dawson v. Briggs*, 107 S.W.3d 739, 750–51 (Tex. App.—Fort Worth 2003, no pet.).

[36] *Rivera v. White*, 234 S.W.3d 802, 806 (Tex. App.—Texarkana 2007, no pet.).

not always possible because Marcus worked three jobs.  He and Junior had a loving relationship, and Junior would express his love for his father through birthday cards, thank you cards, and Father's Day cards.  Marcus said it hurts every time he thinks about his son's death, and it is difficult to talk about.  It still hurts to listen to his son's favorite music, and all holidays are difficult for him.  Considering the applicable standard of review, we cannot say that the evidence supporting the findings is so weak or the evidence to the contrary so overwhelming that the answer should be set aside.[37]  We overrule Yagnik's fourth issue.

## Conclusion

Having overruled Yagnik's four issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and GABRIEL, JJ.

DELIVERED:  April 18, 2013

---

[37] *See I-Gotcha*, 903 S.W.2d at 839–40.

17