**CONVALESCENT SERVICES, INC. d/b/a Bayou Glen Nursing Home, Appellant,**

**v.**

**Mark SCHULTZ and Lillian Schultz, Individually and as Next Friend for Jacob Schultz, Appellees.**

No. 14–94–01198–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 14, 1996.

Rehearing Overruled May 16, 1996.

Kathleen Walsh Beirne, Alvin Laser, Linda Joan Cole, Houston, for appellant.

James B. Lewis, Roger A. Berger, Jeffrey H. Uzick, Houston, for appellees.

Before MURPHY, C.J., and AMIDEI and ANDERSON, JJ.

## OPINION

ANDERSON, Justice.

This appeal concerns the legal sufficiency of the evidence supporting the jury's findings of gross negligence and punitive damages. In addition to eight points of error attacking the legal sufficiency of the evidence, appellant, Convalescent Services, Inc., d/b/a Bayou Glen Nursing Home ("Bayou Glen") complains in four additional points that it was denied substantive and procedural due process by the trial court's failure to comply with the standards set forth in *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10 (Tex. 1994). We affirm.

After hospitalization for pneumonia, Jacob Schultz, appellee, was transferred from Seven Acres nursing facility to Bayou Glen on July 5, 1991. At that time, Schultz was 77 years old and suffering from end-stage Alzheimer's dementia. He was bedridden, incontinent, and his limbs were contracted. On admission, Bayou Glen's nursing staff noted that Schultz had a large, very dark red area on his coccyx and buttock, classified as a Stage I or II "decubitus ulcer" (pressure sore or bedsore).[1] The ulcer worsened to at

---

1. According to testimony at trial, the classification of decubitus ulcers involves four stages. A Stage I ulcer is evident when the skin has persistent redness in a certain area caused by pressure, and the redness does not disappear within sixty minutes after the pressure has been released. Stage II is not clearly defined, and an ulcer may progress directly to Stage III. An ulcer is classified as Stage III when it breaks open to expose fat under the skin, and if bone or muscle is exposed, it is a Stage IV.

least Stage III when the skin surface broke open eleven days later, on July 16. On August 25, Schultz was hospitalized for aggressive treatment of the steadily deteriorating ulcer, which had increased in size and progressed to Stage IV, exposing the bone. Schultz underwent several surgical procedures, including debridement of dead tissue and placement of a surgical skin flap to cover the exposed bone. After a hospitalization of over three months, prolonged by infections after surgery, Schultz was released from Cy-Fair Hospital and re-admitted to Seven Acres Nursing Home.

Schultz's family contends that the nursing care at Bayou Glen was so substandard that it precipitated the deterioration of the ulcer, and that this deterioration and the resulting surgical intervention were preventable if proper care had been given. The family sued, alleging that Bayou Glen was negligent and grossly negligent. The trial took place in July 1994, shortly after the decision in *Moriel*. In the first stage of a bifurcated trial, the jury found Bayou Glen negligent, assessed damages at $380,000, and found Bayou Glen guilty of gross negligence as defined in *Moriel*. *See Moriel*, 879 S.W.2d at 23. The jury assessed $850,000 in punitive damages at the close of the second stage of trial. The trial court entered judgment in accordance with the verdict and denied Bayou Glen's post-verdict challenges to the judgment, including its requests for an oral hearing on its motion for new trial and for articulated findings.

Bayou Glen has paid the actual damages, interest thereon and costs, and has received a partial release and satisfaction of the judgment. It asks this court to reverse the gross negligence and punitive damages findings and render a take nothing judgment. The thrust of Bayou Glen's appeal is that there is no evidence that Bayou Glen had actual, subjective awareness of a serious risk to Schultz, that any of its acts or omissions would cause

the decubitus ulcer to progress to Stage IV, or that it acted in conscious disregard of this risk. Bayou Glen contends that the Schultz family only provided evidence of ordinary negligence based on the failure to document care.

## Standard of Review

In reviewing a "no evidence" or legal sufficiency of the evidence point, we consider only the evidence and reasonable inferences that tend to support the jury's finding, and we disregard all evidence and inferences to the contrary. *Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex. 1992). After such a review, if there is more than a scintilla of evidence of probative force supporting the finding, then the finding must be upheld. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex.1989). Our review of the evidence supporting a jury finding of gross negligence is no different.[2] *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326–27 (Tex.1993).

Circumstantial evidence may be used to establish any material fact as long as it rises above mere suspicion. *Browning-Ferris v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). The circumstances relied upon to establish an ultimate fact must have probative force to constitute a basis of legal inference. *Texas Dept. of Corrections v. Jackson*, 661 S.W.2d 154, 157 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). The inference must be reasonably and logically drawn from the evidence. *See Twyman v. Twyman*, 855 S.W.2d 619, 623–24 (Tex.1983) (citing *Walters v. American States Ins. Co.*, 654 S.W.2d 423, 426 (Tex.1983) for the proposition that the jury is free to make a reasonable inferential leap based on the evidence). If the circumstances are consistent with either of two facts, however, and nothing shows that one is more probable than the other, then neither fact can be inferred. *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex.1995)

---

2. *Moriel* directs that we should apply the traditional "no evidence" test. "Although *Burk Royalty* [*v. Walls*, 616 S.W.2d 911 (Tex.1981)] exhorted a reviewing court to look to 'all of the surrounding facts,' our usual process of 'no evidence' review constrains us to look only to the evidence that favors the verdict. Applying tradi-

tional legal sufficiency review since *Burk Royalty*, we have consistently disregarded facts that tend to contradict the verdict." *Moriel*, 879 S.W.2d at 20–21 (citations omitted). The traditional review applies, even though jurors may have considered mitigating evidence that the risk was excusable. *Id.* at 22 n. 14.

(citing *Fifty-six Thousand Seven Hundred Dollars in U.S. Currency v. State,* 730 S.W.2d 659, 662 (Tex.1987)).

■ To sustain Bayou Glen's challenge to the legal sufficiency of the evidence, we must find that the record, viewed most favorably to Schultz, contains no more than a scintilla of evidence of Bayou Glen's gross negligence. "The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence." Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L.Rev. 361, 363–65 (1960). If a no evidence point is sustained by the court of appeals, it is the court's duty to render judgment for appellant. *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 176 (Tex.1986) (per curiam).

### Gross Negligence

■ The common law definition of gross negligence is set forth in *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 920 (Tex.1981), as follows:

> Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

In 1987, the legislature codified the rules governing punitive damages, and as part of that codification modified the common law definition, as follows:

> "Gross negligence" means more than momentary thoughtlessness, inadvertence or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.

Act effective September 1, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex.Gen.Laws 44

(formerly Tex.Civ.Prac. & Rem.Code Ann. § 41.001(5)).[3]

■ In *Moriel,* a landmark opinion, the Texas Supreme Court clarified the definition of "gross negligence." According to *Moriel,* to establish gross negligence for the purpose of imposing punitive damages, there must be evidence that (1) the act or omission, viewed objectively from the standpoint of the actor, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor had actual, subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others. *Id.* at 23. There must be some evidence that logically supports, either directly or inferentially, both elements of gross negligence. *Wal–Mart,* 868 S.W.2d at 327. Evidence of simple negligence will not suffice to prove either component. *Id.*

### (1) Extreme Risk of Harm

■ The "extreme degree of risk" factor is a significantly higher standard than the "reasonable person" test for ordinary negligence. *Moriel,* 879 S.W.2d at 22. The risk must be one that the defendant creates. *Id.* at 22 (citing *Wal–Mart,* 868 S.W.2d at 326 ("[T]he defendant must have actual awareness of the extreme risk created by his or her conduct.")). To determine if acts or omissions involve extreme risk, we must analyze the events and circumstances from the defendant's perspective at the time the harm occurred without resorting to hindsight. *Id.* at 23. The risk created by the defendant's conduct must have been so extreme as to have created the "likelihood of serious injury" to the person affected. *Universal Servs. Co. v. Ung,* 904 S.W.2d 638, 642 (Tex.1995). The extreme risk prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather it requires the likelihood of serious injury to the plaintiff. *Moriel,* 879 S.W.2d at 22. Extreme risk of harm is a function of both the

---

**3.** Recent amendments to Chapter 41, Texas Civil Practice and Remedies Code, eliminate gross negligence as a basis for punitive damages, requiring that all such claims be based on either fraud, malice or, in wrongful death cases, gross neglect. *See* Act of April 20, 1995, 74th Leg., R.S., ch. 19, 1995 Tex.Gen.Laws 108, 110 (now codified at Tex.Civ.Prac. & Rem.Code Ann. § 41.003(a) (Vernon Supp.1996)). Section 2 of the 1995 amendatory act provides that the amendments apply only to causes of action accruing on or after September 1, 1995.

magnitude and the probability of the anticipated injury to the plaintiff. *Id.* This objective prong is the distinguishing feature between conduct which is deserving of punishment and that which merely demands restitution. *Wal–Mart*, 868 S.W.2d at 326.

The Schultz family's expert, Dr. Taffet, provided testimony that established not only the magnitude of the risk involved, but also its probability. He noted that people die from decubitus ulcers. He testified that without proper treatment, the probability of a decubitus ulcer getting worse is very high, but with timely intervention there is a 95% probability of preventing the ulcer from worsening. Dr. Taffet expressed the opinion that the nursing staff at Bayou Glen created an extreme risk to Schultz through its lack of care. Dr. Taffet's major complaint was that the medical records did not show that the nursing staff had turned the patient every two hours. He testified that if a patient with a Stage I ulcer is not turned every two hours, the ulcer *will become* a Stage III or IV. Even though Bayou Glen documented that it provided care for Schultz's incontinence, Dr. Taffet found the procedure involved in providing incontinent care insufficient to provide the degree of repositioning necessary for treating decubitus ulcers. Ms. Burdine, the former state inspector who declined to cite Bayou Glen after investigating the Schultz family's complaint, testified that proper care to prevent worsening of an ulcer of the type Schultz had requires turning from left to right hip to alleviate pressure on the sacral area.

Nurse Theeck, Bayou Glen's Director of Nursing, testified that to prevent a decubitus ulcer from becoming worse, the nurses should follow a protocol of bathing, turning and repositioning, using a "Spenco" mattress, and ensuring the patient's nutritional needs are met. Both Nurse Theeck and Ms. Burdine acknowledged that the medical records are the best evidence of the care that was given. From a review of the record before this court, there is some evidence that Bayou Glen's conduct, in this case its omissions, led to deterioration of the ulcer and the probability of serious injury to Schultz, including that Bayou Glen:

(1) failed to turn Schultz every two hours to prevent the ulcer from developing into a life threatening condition;

(2) failed to notify Schultz's physician, Dr. Wall, about the decubitus ulcer until July 16 when it had progressed to Stage III;

(3) failed to follow doctor's orders by providing daily whirlpool baths on July 16, 17, 23, 24, 25 and 27;

(4) failed to ensure that Schultz received sufficient nutrition to permit healing;

(5) failed to provide a "Spenco" mattress to relieve pressure on the ulcer;

(6) failed to timely document Schultz's progress on a "skin assessment flow chart."

It is reasonable to infer from the failure to document these items of care, while other types of care were often charted, that these specific items of care were not provided. Contrary to Bayou Glen's argument, we do not find it equally likely that the nurses provided the necessary care but failed to note it on Schultz's chart. The inference that the care was not given is also supported by Schultz's rapid deterioration over an eleven day period. In addition, there is some evidence that Schultz developed other ulcers during his stay at Bayou Glen. We reject Bayou Glen's argument that care was provided despite the lack of records and the concomitant inference that his condition deteriorated even though proper care was provided. When the evidence offered to prove a fact is so weak as to do no more than create mere suspicion of its existence, the evidence is no more than a scintilla, and legally constitutes no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). To conclude otherwise would encourage lack of documentation in medical records to avoid a finding of failure to give proper care.

Bayou Glen urges our consideration of other possible factors that arguably contributed to Schultz's inability to heal more readily. Bayou Glen cites Schultz's poor health in general as a factor in his failure to heal. In addition to being bedridden and suffering from Alzheimer's disease and incontinence, Schultz was malnourished on admittance. Schultz was unable to turn himself, and need-

ed assistance in all activities of daily life. The family's expert, Dr. Taffet, agreed that these factors placed Schultz at "incredibly high risk" for decubitus ulcers. Bayou Glen argues that it did not have sufficient control over the progress of Schultz's condition to warrant a conclusion that its conduct alone created an extreme risk. We disagree. These conditions only highlight the potential peril to Schultz, increasing the probability that serious harm would result if Bayou Glen's nursing staff failed to provide regular monitoring and care. Dr. Taffet described Schultz as "fragile" and his condition "gave the nurses no leeway." He testified that "[i]f they didn't turn him every two hours, he was going to go down the way he did."

Therefore, we conclude there is some evidence that Bayou Glen's failure to give sufficient care created an extreme risk that Schultz's condition would worsen and could ultimately cause his death.

### (2) Actual, Subjective Knowledge

■ Before a gross negligence finding can be sustained, the evidence must show *both* that the conduct was likely to result in serious harm *and* that the defendant was *consciously indifferent* to the risk of harm. *Moriel*, 879 S.W.2d at 22. The focus, in the second prong of the test, on the defendant's mental state requires that "the actor, although not actually intending to cause harm, must have proceeded with knowledge that harm was a 'highly probable consequence.'" *Wal–Mart*, 868 S.W.2d at 325.

Nurse Theeck, Bayou Glen's Director of Nursing, testified that when Schultz was admitted with a large red area on his buttock and coccyx that "bells and whistles" should go off for a nurse treating Schultz. She agreed that this red area was the beginning of what could be a serious problem if timely intervention were not made. She acknowledged that it is incumbent on the nursing home's staff to take measures to prevent decubitus ulcers from becoming worse, and without proper treatment the ulcers get worse "most of the time." Nurse Theeck agreed that Bayou Glen treated patients with the same basic problems that Schultz had when admitted and that the staff was famil-

iar with the treatment necessary for those with Alzheimer's disease, those who were incontinent, and those who were bedridden. This testimony constitutes some evidence that Bayou Glen had actual, subjective awareness of the risk.

The record also includes circumstantial evidence supporting an inference that Bayou Glen consciously disregarded the risk of serious harm to Schultz. A defendant's subjective mental state may be proved by circumstantial evidence. *Moriel*, 879 S.W.2d at 23. Nurse Theeck acknowledged that, as director, she was responsible for the entire nursing staff. She agreed that Bayou Glen's policy required nurses to make notes of observations of patients during each of the three shifts for each twenty-four hour period. However, there are no nursing notes in Schultz's records for July 9, 10, 11, 13, 14, or 15. After Schultz's ulcer broke open on July 16, his physician, Dr. Wall, ordered daily whirlpool baths, but no record of a whirlpool bath for Schultz is shown for July 16, 17, 23, 25, 27 or 28.

Schultz cites evidence that Bayou Glen may have falsified records as additional support of its conscious indifference to the risk of harm to Schultz. On a state-required reporting sheet dated July 16, Bayou Glen indicated Schultz had no pressure sores, when by that date Schultz's ulcer had progressed to Stage III. Its records also show it provided lunch and dinner to Schultz on August 25, even though he was discharged from Bayou Glen at 9:15 that morning and transported to Cy–Fair Hospital. In addition, Schultz contends Bayou Glen tried to cover up the fact that it failed to provide sufficient nourishment to Schultz by changing its records to show he was only 5′4″ instead of 5′10″ or 5′11″ as other records and trial testimony showed.

■ The Schultz family argues that this evidence, as well as the omissions cited earlier in this opinion, show that Bayou Glen's nursing staff was guilty of unprofessional conduct, which should subject it to punitive damages. They contend the Nurse Practice Act defined "unprofessional conduct" in

terms that are equivalent to "gross negligence." Section 217.13 of the Act provided:

The term "unprofessional conduct that is likely to injure the public" means any act, practice, or omission that fails to conform to the accepted standards of the nursing profession and which results from the conscious disregard for the health and welfare of the public and of the patient/client under the nurse's care. . . .

22 TEX.ADMIN.CODE § 217.13 (West 1988).[4] We disagree that this provision may be equated with gross negligence as defined in *Moriel.* We concur, however, that the factfinder may reasonably infer that by knowingly or consistently failing to comply with proper nursing standards, Bayou Glen showed conscious disregard for Schultz's health and safety. In addition, Ms. Burdine, the former state inspector, testified that violations of the Nurse Practice Act showed a conscious disregard for the health and welfare of patients.

We determine there is some evidence in the record to establish that Bayou Glen was guilty of the following acts of unprofessional conduct listed in the Nurse Practice Act, summarized as follows:

failing to institute nursing intervention to stabilize a patient's condition or prevent complications;

knowingly or consistently failing to accurately report or document a patient's symptoms, responses, progress, medications, and/or treatment;

knowingly or consistently failing to make entries or making false entries in records pertaining to the giving of medications, treatments, or nursing care; and

failing to administer medications or treatments in a responsible manner.

22 TEX.ADMIN.CODE ANN. § 217.13(1), (2), (3), and (6) (West Supp.1993).

Mark Schultz, Jacob's son, testified that although he visited his father frequently, no one at Bayou Glen informed him or any other family members of the existence of his father's decubitus ulcer. It was not until the

ulcer had progressed to Stage IV that Mark discovered its presence when he noticed a foul odor. When he accused a nurse of failing to keep his father clean, he was finally informed that the odor was caused by infection in the open ulcer. This failure to keep the family informed, again in violation of its policies, is also some evidence supporting an inference of Bayou Glen's conscious indifference.

To counter the evidence supporting its subjective knowledge that Schultz was at risk of serious harm through its failure to provide proper care, Bayou Glen refers us to evidence showing the care it gave to Schultz. In particular, it cites evidence that the nursing staff laboriously spoon fed Schultz and that its efforts in that regard were commended by Dr. Taffet. We cannot, however, under the traditional "no evidence" review, consider the evidence that Bayou Glen cites showing that it gave Schultz "some care." *See Moriel,* 879 S.W.2d at 20 (discussing cases before *Burk Royalty* that erroneously focused on "entire want of care" portion of gross negligence definition in reasoning that "some care" defeated gross negligence). Since *Burk Royalty,* the Supreme Court, when applying traditional legal sufficiency review, has consistently disregarded facts that tend to contradict the verdict. *Moriel,* 879 S.W.2d at 20–21.

We conclude that Bayou Glen's knowing violation of its own policies, its failure to comply with the Nurse Practice Act, its apparent falsification of records, and disregard for doctor's orders constitute more than a scintilla of evidence of its conscious disregard for the risk of serious harm to Schultz. We hold there is legally sufficient evidence to support the jury's finding of gross negligence and overrule points of error one through eight.

**Deprivation of Due Process**

■ In its points of error nine through twelve, Bayou Glen complains that it was denied meaningful post-verdict review in de-

---

4. The Act's definition of "unprofessional conduct" was amended effective February 27, 1991. 16 Tex.Reg. 969 (1991). At trial, Bayou Glen failed to object to the testimony concerning the prior version of the Act, thereby waiving its post-submission complaint about this evidence. TEX. R.APP.P. 52(a).

privation of its due process rights guaranteed by both *Moriel* and the United States Supreme Court. As part of the lack of meaningful review, Bayou Glen complains of the trial court's refusal to conduct a hearing on its post-verdict motions and its failure to articulate findings in support of the jury's award of punitive damages. It points out that Judge Downey, the trial judge, candidly expressed his opinion that he doubted whether there was legally sufficient evidence under *Moriel* to warrant submission of gross negligence to the jury, yet he submitted the question and later refused to explain how the evidence supported the jury's affirmative answer.

The United States Supreme Court has granted certiorari on issues relating to punitive damages and the inherent due process concerns, but "it has given lower courts no bright-line guidance." *Moriel*, 879 S.W.2d at 12 n. 1. First, in *Pacific Mutual Life Insurance Co. v. Haslip,* the Court expressed concern about juries that "run wild" in awarding punitive damages. 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991). In *Haslip,* Pacific Mutual argued that the Alabama punitive damages system was unconstitutional because it provided juries unconstrained discretion to award punitive damages in virtually unlimited amounts and because the specific award was so grossly disproportionate and excessive that it violated due process. The United States Supreme Court concluded, however, that Alabama's procedural safeguards passed constitutional muster and affirmed the punitive damages award. *Id.* at 24, 111 S.Ct. at 1046–47. These safeguards included a requirement for trial judges to articulate their reasons for interfering with an award or leaving it undisturbed. *See Moriel*, 879 S.W.2d at 27 (citing *Haslip*, 499 U.S. at 20, 111 S.Ct. at 1044–45.)

In *Moriel*, the Texas Supreme Court analyzed *Haslip*, but declined to impose a requirement for trial courts to articulate their reasons for upholding punitive damages, noting that most trial courts are overworked and understaffed. *Moriel*, 879 S.W.2d at 33. The court merely noted that such findings would be "helpful" and urged that they be made "to the extent practicable." *Id.*

Bayou Glen asks this court to follow *Honda Motor Co. v. Oberg,* ―― U.S. ――, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), decided shortly after *Moriel.* In *Oberg,* the United States Supreme Court reviewed a state court punitive damages award, and held that Oregon's post-verdict procedures for reviewing punitive damages awards were not sufficient to comport with the demands of due process. *Id.* at ――――, 114 S.Ct. at 2335–42. The procedure in Oregon was significantly different than that in Texas, however. Although an Oregon statute mandated detailed jury instructions concerning punitive damages and a "clear and convincing" standard of proof, an amendment to the state constitution precluded any factual sufficiency review of a jury's gross negligence and punitive damages findings. The amendment prohibited judicial review of the amount of punitive damages awarded by a jury "unless the court can affirmatively say there is no evidence to support the verdict." *Id.* at ―― n. 5, 114 S.Ct. at 2338 n. 5. There was no procedure for reducing or setting aside the award if a defendant's only complaint was the amount of the punitive damages the jury awarded. *Id.* at ――, 114 S.Ct. at 2338. The Court held that Oregon's denial of judicial review of the size of punitive damages awards violates due process. *Id.* at ――, 114 S.Ct. at 2341. Thus, *Oberg* suggests that it is the *amount* of the award that must withstand constitutional scrutiny.

Similarly, in *Moriel,* the Texas Supreme Court was concerned that a review of punitive damages should ensure that punitive damages awards "are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages." *Moriel*, 879 S.W.2d at 29 (citing *Haslip*, 499 U.S. at 22, 111 S.Ct. at 1045). The court instituted a bifurcated trial procedure in punitive damages cases to ensure that the Texas "system of imposing punitive damages, on the whole, provides adequate procedural safeguards to protect against awards that are grossly excessive." *Id.* at 30.

In addition, the court in *Moriel* imposed an obligation on courts of appeals to detail the relevant evidence in our opinions when con-

ducting a *factual* sufficiency review, explaining why the evidence supports or does not support the punitive damages award in light of the factors in *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). *Id.* at 31. This heightened post-judgment review mandated by *Moriel* has been found to satisfy due process. *See, e.g., Merrell Dow Pharmaceuticals, Inc. v. Havner*, 907 S.W.2d 535, 560 (Tex.App.—Corpus Christi 1995, writ granted) (en banc); *I–Gotcha, Inc. v. McInnis*, 903 S.W.2d 829, 845 (Tex.App.—Fort Worth 1995, writ denied). Thus, adequate post-verdict review of punitive damages may be achieved at the appellate level.

In this case, we are not presented with a challenge as to the *amount* of the punitive damages; there is no claim the damages awarded are excessive. Instead, we are simply presented with a challenge to the *legal* sufficiency of the evidence supporting the jury's determination that Bayou Glen was guilty of gross negligence. In this context, Bayou Glen's due process arguments are misplaced.

Even if an examination of the *Kraus* factors were required here as it is when factual sufficiency is raised, we would find that the evidence in this case supports the punitive damages. The *Kraus* factors include:

> (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety.

*Kraus*, 616 S.W.2d at 910. The nature of the conduct in this case compels a finding that punitive damages are warranted. Schultz was totally dependent on Bayou Glen for all activities of daily life. He was helpless to even complain about any severe pain he was suffering. This vulnerability enhances the seriousness of the risks to which Bayou Glen's conduct exposed Schultz. Bayou Glen was responsible for caring for Schultz's needs and protecting him from injury. Through its omissions, Bayou Glen permitted his condition to deteriorate and develop into a life-threatening situation. It consistently violated its own policies and nursing procedures. Bayou Glen permitted Schultz to rapidly deteriorate without even informing his family of the existence of a decubitus ulcer and the seriousness of the risk it posed. These actions certainly offend a public sense of justice and propriety warranting the imposition of damages both as punishment and as a deterrent to such practices in an effort to ensure quality care for elderly persons in nursing homes.

In accordance with *Moriel*, we have carefully scrutinized the evidence in this case, within the constraints of the points of error urged on appeal, in an effort to provide thorough post-verdict review. In light of the procedural protections effected through bifurcation and careful appellate review, as well as *Moriel's* precatory language regarding trial court findings of fact, we cannot say that the trial court's failure to conduct a hearing on Bayou Glen's post-verdict motions or to articulate its findings deprived Bayou Glen of due process. *See also Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 852 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (holding that failing to conduct hearing on motion for new trial and allowing it to be overruled by operation of law does not violate due process or equal protection). Therefore, we overrule Bayou Glen's points of error nine through twelve.

We affirm the judgment of the trial court.