**SERV–AIR, INC., Appellant,**

v.

**Jane E. PROFITT, Individually, and as Executrix of the Estate of Maj. Gen. Glenn A. Profitt, II, Deceased; Glenn S. Profitt; David S. Profitt; Glenn A. Profitt and Jessie L. Profitt;[1] and Michelle Carey, a Widow, Individually**

1. While this appeal was pending, the Profitt appellees and Serv–Air, Inc. notified the Court that they had settled their dispute.

and as Next Friend of Patrice Marie Carey; Shawn Thomas Carey and Chris Gordon Carey, Minors, and as Independent Executrix of the Estate of Captain Paul Edwin Carey, Deceased, Appellees.

No. 04–97–00703–CV.

Court of Appeals of Texas,
San Antonio.

Aug. 31, 1999.

Concurring and Dissenting Opinion
Oct. 13, 1999.

Opinion on Rehearing
Feb. 16, 2000.

Sharon E. Callaway, Wallace B. Jefferson, Ellen B. Mitchell, Crofts, Callaway & Jefferson, P.C., San Antonio, Martin E. Rose, Rose-Walker, L.L.P., Dallas, Allison Freeman Logan, Gardere & Wynne, L.L.P., Dallas, for Appellant.

Russell H. McMains, Law Offices of Russell H. McMains, Corpus Christi, James L. Branton, Carol P. Lomax, Branton & Hall, P.C., San Antonio, Jack Pasqual, Jack D. Pasqual, Jr., Law Offices of Jack Pasqual, P.C., San Antonio, L. Rich Humpherys, Christensen & Jensen, P.C., Salt Lake City, UT, for Appellee.

Sitting: ALMA L. LÓPEZ, Justice
CATHERINE STONE, Justice PAUL W. GREEN, Justice.[2]

## OPINION

Opinion by: ALMA L. LÓPEZ, Justice.

This is a wrongful death and survivorship case arising from an airplane crash in which all eight aboard were killed. The Air Force Learjet C–21A crashed near Mobile, Alabama, *en route* from Andrews AFB to Randolph AFB. Several parties settled before and/or after the three-week trial.[3] The jury found that Serv–Air, the maintenance contractor for the plane, was 75% negligent and SimuFlite, the pilot

---

2. Dissenting opinion to follow.

3. The Carey plaintiffs intervened and joined three Serv–Air related defendants, who were later non-suited—two mechanics, Jerry Hornback and Lowell E. Spears, Jr., and the parent corporation, E–Systems, Inc. Original defendants, Learjet and Lear–Romec, the manufacturers, entered into a confidential settlement with plaintiffs prior to trial.

training contractor, was 25% negligent. The jury found no negligence on the part of Captain Carey, Learjet or Lear–Romec. The trial court entered judgment on the jury's verdict, awarding the Carey plaintiffs $3,379,859.11 and the Profitt plaintiffs $1,862,120.38 jointly and severally against Serv–Air and SimuFlite, plus $10 million in exemplary damages against Serv–Air. SimuFlite then settled with all of the plaintiffs and Serv–Air settled with the Profitt plaintiffs. The remaining parties before us on appeal are Serv–Air, Inc. and the survivors of co-pilot, Captain Paul Edwin Carey. Serv–Air raises eleven issues concerning evidentiary sufficiency, exemplary damages, jury questions, necessary parties, and settlement credits.

### The Cause of the Crash

A severe fuel storage imbalance in the wings caused the left wing to hold 1,800 pounds more fuel than the right wing. This made the plane uncontrollable, it went into a spin and crashed. The imbalance was caused by a malfunction of the right wing standby fuel pump. A worn bearing in that standby pump caused a surge in electricity, which resulted in the K–1 relay contact points for that pump to be welded together so that the pump ran "uncommanded," i.e., even though it was not triggered by a cockpit switch. This relay is located in the fuel control relay panel. The K–1 relay was described in expert testimony as having "a mountain of metal on one point, or one contact, and a valley on the other," as a result of repeated arcing over a long period of time.

Although there were other mechanical (electrical) malfunctions that were apparent either to the flight or maintenance crew on the ground at Randolph AFB where the flight originated, en route to Wright–Patterson AFB, and later that day at Andrews AFB, the condition of the standby pump or the fuel control relay panel did not come to their attention.

Arriving at Andrews, the pilots documented two malfunctions: a circuit breaker problem affecting the Flight Data Recorder and a problem with the fuel system, i.e., they noted that the fuel would not transfer aft from the wing tanks to the fuselage tank. Serv–Air's maintenance contract procedures required the Serv–Air mechanic, David Amadei, at the outset of his inspection, to fill out Form 781A and place a red symbol denoting the seriousness of the conditions reported by the pilots. He did not do so and testified that he was unaware that he was suppose to make this indication at the outset of his inspection.

The significance of this procedure is that the plane could not be released as airworthy until after the condition was corrected and the red symbol was removed from this form. Amadei was in the process of troubleshooting when he and the commanding pilot discussed the status of the plane and the pilot decided to defer further maintenance until the plane reached its home base, Randolph AFB. Had the existing conditions been recorded as "Red–X", the pilot would not have had that option. The plane would have received further troubleshooting maintenance and/or the crew would have been given another plane for the completion of their mission. At the time his troubleshooting was interrupted, Amadei had removed the fuel control panel and was going to replace it with a new one. If that did not fix the problem, the next logical step was to replace the fuel control relay panel and, thereby replace the faulty relay switch.

On the final leg of the mission, experts testified, when the pilots started the engines, the right standby pump should only have operated briefly. Because of this long-term metal buildup, however, the contacts in the K–1 relay switch fused together in an "on" position, leaving the right standby fuel pump running continuously. As the severe fuel imbalance materialized, the pilots followed each of three corrective procedures outlined in the "Dash–1" manual[4] but none of these procedures worked.

4. Dash–1 in this context refers to the Air Force operational manual for the C–21A Lear-

There was a fourth procedure, not included in the Dash–1, which the manufacturer had issued in 1990 which might have allowed the pilots to maintain control of the aircraft, but this procedure had not been adopted by the Air Force and was not implemented.

### PROXIMATE CAUSE

In its first two issues, Serv–Air argues that its acts and/or omissions did not proximately cause the crash.

### 1. The Standards of Review

 When reviewing the legal sufficiency of the evidence, we consider only evidence and inferences tending to support the jury findings, disregarding all evidence and inferences to the contrary. *See Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex. 1992). Challenges to the legal sufficiency of the evidence issues:

> must be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence established conclusively the opposite of a vital fact.

*Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997) (citing Robert W. Calbert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)), *cert. denied,* — U.S. —, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *see also* W. Wendell Hall, *Standards of Review,* 29 ST. MARY'S L.J. 351, 477 (1998). Thus, if we find any evidence of probative force to support the jury's findings, the point must be overruled and the findings upheld.

 A review for factual insufficiency, on the other hand, requires the court of appeals to consider, weigh, and examine all of the evidence that supports and that is contrary to the jury's determination. *See Plas–Tex, Inc. v. United States Steel*

*Corp.,* 772 S.W.2d 442, 445 (Tex.1989). Where there is conflicting evidence, the jury's verdict is conclusive. We will set aside the verdict only where we find the evidence standing alone to be so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

### 2. Legal Sufficiency

 A finding of proximate cause requires a showing of both cause in fact and foreseeability. *See Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 777–84 (Tex. 1995) (Cornyn, J., concurring) (history of development of causation in Texas law). Serv–Air isolates the proximate cause to the condition of the standby pump for which it was not responsible for any maintenance or periodic checks because this equipment was expected to last for the life of the plane. Therefore, Serv–Air argues that its negligent maintenance of the craft on the day of the crash was neither the cause in fact nor foreseeable. The standby pump failure is too remote to Serv–Air's maintenance duties to constitute a legal cause. To reach this conclusion, Serv–Air relies on its own expert witnesses and ignores the rest of the evidence that was placed before the jury.

It is undisputed that the 1,800 pound fuel imbalance made the plane uncontrollable. A worn bearing in the right standby pump caused an electrical surge. A relay in the fuel control relay panel fused in the closed position. This caused the pump to run uncommanded, even though the pilot's cockpit switch indicated it was in the "off" position. This fuel control relay panel, installed by appellant, had been "cannibalized" or taken from another aircraft at Randolph AFB three months before the crash (itself a violation of Air Force regulations and Serv–Air's contract). Jerry Hornback, Serv–Air aircraft mechanic at Randolph AFB, testified that when the part was taken out of the other plane, the mechanic did not know its history. He

jet, which is the military version of the civil- ian model 35A/36A Learjet.

knew he was installing a used relay panel with unknown history in the plane that ultimately crashed. Hornback admitted that this part had an impact on the electrical system of the plane. While the plane was at Andrews AFB, Amadei, the aircraft mechanic, conducted a troubleshooting protocol because "something was not allowing the [fuel] system to work correctly." Amadei did not understand what was wrong with the aircraft, he had not completed his troubleshooting protocol, and had not documented that his work was incomplete. Amadei testified that this plane should have been Red–Xed and that he was the person who should have grounded the plane on the day of the crash. The jury heard more than a scintilla of evidence that tied Serv–Air's negligent maintenance practices to the proximate cause of the crash.

### 3. Factual Sufficiency

■ Following the flight from Wright Patterson AFB, Ohio to Andrews AFB, Capt. Carey filed a written report indicating mechanical discrepancies or problems experienced in-flight. Among the problems noted were: "the flight data record circuit breaker won't reset; . . . Fuel will not transfer aft. No light flash or other indications of operation." Robert Ulrich, plaintiffs' pilot expert, testified that when a pilot writes up such a report upon landing, he will rely on the mechanic to address the problem, "then you basically hand the plane over to the maintenance people to take over the problem." The pilot would then expect the mechanic to "then determine the type of symbol to place with that write-up." Following any repairs, the pilot would expect that the maintenance work performed would also be recorded and a new status symbol placed on the sheet.

If Serv–Air had instructed its mechanics to follow the procedures required in the Air Force contract, Amadei would have Red–Xed the plane at the start of the troubleshooting process, and the plane would not have been cleared for flight until Amadei understood the underlying prob-

lem, fixed it, and cleared it with his supervisor. Serv–Air states its mechanic tested the right standby fuel pump during the troubleshooting procedures at Andrews and the pump, the relay, and the switch all worked fine. It was the worn bearings in the standby pump that caused the electrical surge, rather than the other electrically-related problems that were reported by the flight crew upon reaching Andrews. Serv–Air stresses that the various electrical systems on the plane are all separately wired, so that an electrical problem in one system would not necessarily indicate an electrical problem in another system.

Serv–Air also disagrees with appellees' characterization that this was a fuel system problem, stressing instead that Amadei was troubleshooting one faulty transfer-fill switch that affected the fuselage tank only, a problem Serv–Air says did not affect the airworthiness of the plane. The jury, however, heard General L.E. Curtis, a maintenance and quality assurance expert, testify to the importance that every discrepancy be recorded as completely as possible so that as mechanics "troubleshoot, they can identify these linkages and interconnections as they point to a more severe underlying problem. . . . As you troubleshoot an aircraft you just don't look at the discrepancy that's written up. You're troubleshooting the entire aircraft as an entity." Once a pilot turns the plane over to maintenance, maintenance is "responsible and accountable for providing a full documentation of the maintenance of the aircraft to the air crew prior to the next flight."

In addition, Serv–Air claims there were intervening causes of the crash: the commanding pilot's decision to defer maintenance interrupted maintenance troubleshooting and the fact that the relay switch welding that caused continuous uncommanded transfer of fuel to the left wing occurred after take-off from Andrews. Neither of these events would have occurred, however, if Serv–Air's mechanic had followed mandatory protocol, per-

formed a timely and accurate documentation of his troubleshooting and designated the status of the craft as "Red–X". We do not find the evidence as a whole to be so weak as to be clearly wrong and manifestly unjust. Appellant's first two issues are overruled.

## PILOT ERROR

■ In its third issue, Serv–Air asserts that the jury's finding of no negligence on the part of the pilot, Capt. Carey, is against the great weight and preponderance of the evidence. Serv–Air argues that the pilot should have realized that the cross-flow valve was open, allowing the transfer of fuel from right to left wing. If Carey had closed that valve after jettisoning excess left wing fuel during his last attempt at corrective procedures, the left wing would not have refilled with fuel causing another imbalance. Serv–Air attributes this failure to lack of pilot training and panic.

■ Our review of this point again requires that we examine the entire record to determine if there is some evidence to support the jury finding of no negligence. We may reverse and remand a case for new trial only when the great weight of the evidence supports an affirmative answer to the jury question. *See Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988). In 1990, Learjet published in its civilian aircraft training materials a checklist of procedures for responding to "fuel imbalance with cross-flow valve closed." These procedures were not included in the military training manual, the "Dash–1." Nor were these procedures taught by Simu-Flite, the government contractor for military pilot training. However, a pilot expert testified that, in one of five SimuFlite pilot training seminars he attended while he served in the Air Force, he heard talk of this problem in scuttlebutt during the breaks with other pilots. It was not taught as part of the class. It is undisputed that the pilots were presented with an unexplained and confusing situation which was not corrected by following the Dash–1 procedures. The jury also heard evidence

of a similar incident experienced in 1993 by a civilian pilot in Oregon who did not respond by "simply closing the cross-flow valve." That pilot was able to land the plane and the problem was remedied by replacing the fuel control relay panel. In reviewing the entire record, we do not find that the jury's negative finding on pilot error to be overwhelmingly against the great weight and preponderance of the evidence. Appellant's third issue is overruled.

## DESIGN DEFECTS

■ In a fourth issue, Serv–Air contends that the jury's finding of no negligence on the part of Learjet and Lear–Romec is against the great weight and preponderance of the evidence. Serv–Air argues that the standby pump, manufactured by Lear–Romec, intended to last the lifetime of the aircraft, carried no warnings of potential wear to the bearings nor did they require regular maintenance or service checks. An electrical systems expert testified that the relay panel and contacts were not lasting the life of the plane because the electrical current exceeded the design specifications. In addition, the jury heard evidence of a design defect, *i.e.,* there was no "disagreement" light on the pump like there was on the cross-flow valve, which would have indicated that although the switch showed the pump was "off" it was actually "on."

Serv–Air further points to Learjet's failure to advise the Air Force, in breach of their contract obligation, of the potential mechanical malfunction of the standby pump after it had issued a revision to the aircraft flight manual for its other equivalent models. Expert testimony stated that had the pilots had the revised procedure in their Dash–1 manual, they could have solved the fuel imbalance problem and safely landed the plane.

Appellees respond that this is not a failed pump case, it is an electrical failure case. The jury heard a great deal of testimony about several electrical malfunc-

tions reported by the pilots on this mission. With the level of reported, unsolved problems, this plane should have been grounded. Also, Learjet's maintenance and training contract had expired, the maintenance portion had been awarded to Serv–Air, and the training portion of the contract to SimuFlite, a post-trial settling defendant. We do not find that the great weight of the evidence would require the jury to shift blame to Learjet and Lear Romec. Appellant's fourth issue is overruled.

## Gross Negligence

 In issues five, six, and seven, Serv–Air argues that there is no evidence of gross negligence to support the jury's award of punitive damages. Objectively speaking, Serv–Air's conduct must create "an extreme degree of risk" to support a finding of punitive damages. *See Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 21–22 (Tex.1994). Remote possibilities do not meet the test, rather, the conduct must create the "likelihood of serious injury." *See Universal Servs. Co., Inc. v. Ung,* 904 S.W.2d 638, 641 (Tex.1995). The risk must be defendant's creation and unjustifiable. *See Moriel,* 879 S.W.2d at 19–23; *Convalescent Servs., Inc. v. Schultz,* 921 S.W.2d 731, 736 (Tex.App.—Houston [14th Dist.] 1996, writ denied) (extreme risk met because person's condition with type of ulcer at issue would definitely deteriorate to life threatening state if not given proper care). From a subjective perspective, the evidence must show that the defendant had actual, subjective awareness of the risk involved, and proceeded with conscious indifference to the rights, safety, or welfare of others. *See Moriel,* 879 S.W.2d at 23.

### A. Legal Sufficiency

 Serv–Air bases its arguments, that the evidence is legally insufficient to support punitive damages, on its pump failure theory contending it had no duty to inspect, service, or maintain the pump and, therefore, the cause is too remote to warrant punitive damages. As it had no knowledge of the bearing failure which caused the electrical surge, Serv–Air argues there was no proof of conscious indifference. This argument ignores the fact that Serv–Air's lead mechanic, Amadei, released the aircraft from maintenance with an electrical problem that he had not fixed; he knew he had not fixed it, and worse, he had not told anyone that he had not fixed it. He says he did tell the pilots he had figured out how to transfer fuel between tanks by "tricking" the system, but he did not document any of this—all contrary to required operating, contractual procedures. He never informed the air crew of the non-airworthy status of the plane. The jury could reasonably conclude that this conduct created the likelihood of serious injury. Serv–Air's evidence of justification attempted to point the finger at the commanding pilot, whose decision to defer further troubleshooting until the plane arrived at home base was based on the absence of the very documentation needed to properly assess the status of the plane. The jury had more than a scintilla of evidence to conclude that the act of releasing a jet plane with known electrical problems in the fuel control system that had not been resolved and that were essential to its operation while completely ignoring the documentation procedures that would have identified these issues and grounded the plane was gross and conscious indifference to the rights, safety, or welfare of others.

Many months into the new Air Force contract, Serv–Air mechanics testified that they had not reviewed the Air Force contractual requirements regarding quality assurance, safety, and standard operating procedures, and were totally unfamiliar with the forms which required red symbols (e.g., the Red–X). The jury also heard testimony that a Serv–Air employee, who had no relevant training in C–21A maintenance, was delegated the duty of performing a mandated, six-month inspection on the plane in question three weeks before the crash. Of the eight steps this employee was assigned to complete, he only did two of them—yet another Serv–

Air technician certified the entire eight-step inspection on that basis. The aircraft passed the six-month inspection. The jury heard other evidence of a Serv–Air supervisor at Randolph not following procedures involving the proper handling of a Red–X documentation, and that its Andrews maintenance crew followed work rules dramatically at odds with Air Force contract requirements. For example, Amadei testified that, pursuant to work rules adopted by Serv–Air in 1995, if he did not complete certain work because he had not yet fixed the problem, the problem did not get documented. Air Force rules require documenting the problem as soon as it is noted, not after it is fixed. Another Serv–Air witness admitted, on cross-examination, that it was in his company's financial interest not to document unresolved maintenance problems, because non-documentation helped the company avoid liquidated damage penalties under its maintenance contract with the Air Force. An Air Force review of Serv–Air's contractual performance reported numerous systematic maintenance quality problems. General Curtis testified that Serv–Air's practices constituted gross negligence.

 Alternatively, Serv–Air argues the evidence is legally insufficient to attribute any vice-principal's gross negligence to Serv–Air. In other words, if Amadei's failure to Red–X or ground the plane is gross negligence, there is no evidence that Serv–Air authorized or ratified it or that Amadei meets the legal definition of vice-principal, he was simply an employee. *See Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex.1997) (grossly negligent act must be act of corporation, not act of mere servant or employee, unless so authorized or approved by corporation). Jury Question No. 5 allowed the jury to base its

gross negligence finding on the acts of "Serv–Air, Inc., its agents or employees."

Appellees respond that Serv–Air did not raise this issue at the trial level, that Serv–Air was contractually obligated to insure the adequate training of its personnel and the implementation of the maintenance procedures specified in technical orders. These are nondelegable duties. *See Hammerly Oaks*, 958 S.W.2d 387 (certain nondelegable duties of the corporation cannot be assigned to an employee so as to relieve the corporation of liability, supporting an award of punitive damages). The jury heard evidence that Serv–Air's practice of non-documentation of unresolved maintenance problems was a system-wide failure in training and supervision. The nationwide practice was admitted by Serv–Air's expert. This unwritten but wide-spread practice, at odds with its absolute contractual obligations to the Air Force, is similar to the level of gross negligence and conscious indifference found on the part of the corporate entity in *Ellender*. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 923 (Tex.1998) (Mobil's policy of monitoring and protecting its own employees regarding exposure to benzene for cleaning tools was not extended to contract workers; held to be sufficient for jury to infer that Mobil knew the risks of benzene exposure yet proceeded with conscious indifference to safety and welfare of contract workers). Issues five and six are overruled.

**B. Statutory Cap**

 Serv–Air complains the punitive damages awarded the Carey Estate were excessive as they exceed the statutory cap of "four times the amount of actual damages or $200,000, whichever is greater." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.007 (Vernon 1994)[5]. The jury awarded $5 million to the Carey family members

---

**5.** This provision has since been revised and renumbered as § 41.008(b) by the 74th Legislature. *See* TEX. CIV. PRAC. & REM.CODE § 41.008(b) (Vernon 1997). Currently, the relevant provision reads: "Exemplary damages awarded against a defendant may not

exceed an amount equal to the greater of: (1)(A) two times the amount of economic damages; plus (B) an amount equal to any non-economic damages found by the jury, not to exceed $750,000; or (2) $200,000." *Id.*

and Estate and directed that 100% of the award go to the Estate of the deceased. The jury awarded actual damages for pain and mental anguish to the Estate of Captain Paul Edwin Carey in the amount of $150,000. Serv–Air seeks a remittitur of $4,400,000 as to the Carey Estate.

Public policy interests dictate that punitive damages are available so that juries might exact a punishment against a wrongdoer. *See Moriel,* 879 S.W.2d at 16. These interests are best served when the punitive damages are reasonably related to the total amount of harm that occurred as reflected by the actual damages awarded the plaintiff. *See I–Gotcha, Inc. v. McInnis,* 903 S.W.2d 829, 840 (Tex.App.—Fort Worth 1995, writ denied). The magnitude of wrongful conduct is the pivotal factor in assessing this award against the defendant. The statutory cap on punitive damages serves to impose a reasonable ratio between the degree of wrongful conduct and the amount of punishment to be dispensed. Where the harm inflicted was small, the statutory cap insures that the punishment will be relatively small. Where the harm inflicted is devastatingly great, the cap permits great punishment.

The focus on the level of the punishment is not on the recovery of individual plaintiffs who are harmed, as Serv–Air argues in its brief, rather it is on the degree of harm caused by the wrongful conduct of the defendant. In this case, great harm resulted from Serv–Air's conduct. Eight people died. To focus on who is recovering how much in actual damages would improperly shift the emphasis away from what the defendant did do. It is irrelevant who gets the punitive damages in the legal sense; what matters is that the defendant is punished in relation to the harm it actually caused. *Cf. I–Gotcha, Inc. v. McInnis,* 903 S.W.2d at 841 ("actual damages" as used in punitive damage cap refers to damages findings by jury prior to court's reduction for contributory negligence findings).

There are scholars, legislators, and judges who believe punitive damage awards should properly go to the State rather than to the injured parties. Such damages are designed to punish and deter the defendant—not to provide a windfall to the plaintiff who is already made whole through recovery for actual damages. *See e.g., General Resources Organization, Inc. v. Deadman,* 932 S.W.2d 485 (Tex.1996) (Gonzalez, J.) (concurring opinion on denial of application for writ of error); *Moriel,* 879 S.W.2d at 17 & n. 7 (Cornyn, J.) (quoting W. Page Keeton, et al., PROSSER AND KEETON ON THE LAW OF TORTS, § 2 at 14 (5th ed.1984)). For punitive damages to be effective, however, it really doesn't matter who gets the money. The defendant is punished in any case.

Although, in this case, the wrongful conduct was great and the damages catastrophic, the defendant would not receive a proportionate punishment under appellant's suggested application of the cap. This would defeat the very purpose of the punitive damage award. The jury awarded actual damages to the Carey plaintiffs in the following amounts:

| | |
|---|---|
| Michelle Carey | $3,650,000 |
| Patrice Carey | 349,000 |
| Shawn Carey | 328,000 |
| Chris Carey | 391,000 |
| Carey Estate | 150,000 |
| Total | $4,868,000 |

The jury assessed against Serv–Air and awarded punitive damages in the amount of $5,000,000 to the Carey plaintiffs. The jury then apportioned 100% of the punitive damages to the Carey Estate. This award is well within the ratio permitted under the statutory cap. Appellant's seventh issue is overruled.

### DOUBLE SUBMISSION OF THE NEGLIGENCE QUESTION

The basic negligence liability questions were submitted twice to the jury. Questions 1 & 2 are identical to questions 3 & 4—except the latter set also inquires of the negligence of pilot/plaintiff Carey. Serv–Air claimed Carey was contributorily negligent by committing pilot error. In question 3, the jury found Carey was not

negligent. Appellant argues this format suggested that Serv–Air was negligent and that Carey was not (because the issue of Carey's negligence was not submitted in the first instance). Further, appellant argues that the double submission commented on the weight of the evidence and suggested that Serv–Air's responsibility was greater than other parties. Serv–Air was always listed first, rather than in alphabetical order (or in the order of the pleadings). Carey's potential liability for pilot error was not presented until Serv–Air's had been presented three times. Serv–Air claims this misled and confused the jury and harm is demonstrated in the jury's failure to find any negligence by Carey in the face of substantial evidence of pilot error. Serv–Air suggests the jury could have concluded that question 3 was merely redundant of question 1, where it had already found Serv–Air and SimuFlite negligent—especially where no instruction was given for question 3 that would instruct the jury not to consider its answer to any previous question when answering question 3.

Questions 1 and 2 refer to the defendants who may have proximately caused injury to the Profitt parties. The Profitt plaintiffs did not raise a cross-claim against the Careys and the issue of pilot error by Carey is not relevant to the issue of the defendants' negligence proximately causing injury to the Profitts. Questions 3 and 4 were submitted as to the Carey parties' claims and this set of issues reflected Serv–Air's affirmative defense against Carey.

■ The jury charge did not explain or comment on the so-called double submission. The jury was instructed to "simply answer the questions and do not discuss nor concern yourself with the effect of your answers." The jury was totally consistent in answering questions 1 and 2 and

questions 3 and 4. Absent any evidence to the contrary, an appellate court must assume that a jury properly followed the trial court's instructions. *See Turner, Collie & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982). Issue number eight is overruled.

### FAILURE TO ABATE THE CAREY ACTION

■ Captain Carey's parents pursued a separate lawsuit in Dallas for wrongful death during the time his wife and children intervened in the Profitt action here. The Dallas action was filed one day before Michelle Carey intervened in the San Antonio action which is the subject of this appeal. Serv–Air noted this in its original pleading, and shortly before the first trial setting, filed a motion to abate which was denied in a pre-trial hearing.[6] After judgment but before the motion for new trial was heard, Carey's parents settled their claims by taking an assignment of a portion of the Carey recovery and non-suiting their Dallas claims. The trial court denied reconsideration of the motion to abate, finding that the Carey parents' Dallas action had not been timely filed on behalf of the Carey Estate and that the San Antonio joinder was timely and filed by the independent executor and therefore properly before the court. The trial court also denied appellant's motion to abate at the hearing on the motion for new trial.

Appellant claims it was error to proceed to trial in San Antonio when all the Carey beneficiaries had not been joined. The Texas Wrongful Death Act identifies the statutory beneficiaries of such action, namely, the surviving spouse, children, and parents of the deceased. TEX. CIV. PRAC. & REM.CODE ANN. § 71.004(a) (Vernon 1997). Texas courts have long held that all the beneficiaries named in the act are necessary parties. *See Avila v. St. Luke's Lutheran Hosp.,* 948 S.W.2d 841, 850 (Tex.

6. Judge Andy Mireles heard this motion in presiding court. Serv–Air's counsel was delayed en route from Dallas and did not arrive in time for the pre-trial hearing. The court heard argument by local counsel representing co-defendant SimuFlite and opposing counsel, denied both pleas in abatement and indicated that both parties were free to present these issues on reconsideration to the judge assigned to try the case.

App.—San Antonio 1997, writ denied). In *Avila*, three surviving adult Jimenez children sued a hospital and medical personnel for damages in connection with the medical treatment their father received. They settled the suit and entered a consent judgment. Four years later, a half-sister of the adult children, who had been born post-humously, filed a wrongful .death action against some of the same defendants. The trial court granted a summary judgment based upon collateral estoppel and this court reversed because there was no proof of privity between the adult children and the baby half-sister. The adults did not know of their sister at the time the consent judgment was entered and the baby's mother did not know the first lawsuit had been filed and settled. *See id.* at 855 (Rickhoff, J., concurring).

The facts mandating reversal in *Avila* are distinguishable from this case. The Wrongful Death Statute provides that "one or more of the statutory beneficiaries *may* bring the action for the benefit of all." *See* Tex. Civ. Prac. & Rem.Code Ann. § 71.004(b). Most significantly, the adult Jimenez children did not sue on behalf of all beneficiaries of their deceased father. Their original petition does not mention Avila or any other statutory beneficiaries. Secondly, the first suit resulted in a settlement and consent judgment while this case involved a contested jury trial. Thirdly, Avila was unaware of the first lawsuit. That is not the case here where the Carey and Profitt plaintiffs invited the Carey parents to join this lawsuit and, although this invitation was declined, the Carey parents participated in extensive discovery with the other Carey parties and ultimately took an assignment of the Carey judgment and abandoned their claims in the Dallas suit.

There is another reason why the trial court ruled correctly in denying a motion to abate in this case. The Wrongful Death Act provides a window of time within which any statutory beneficiary may file an action "for the benefit of all." *See id.* However, if none of them do so within three calendar months of the date of death, "his executor or administrator shall bring and prosecute the action unless requested not to by all those individuals." *Id.* at § 71.004(c). Michelle Carey was appointed independent executrix of the Carey Estate three weeks after Captain Carey was killed. The time during which any statutory beneficiary could bring an action on behalf of all beneficiaries expired on July 19, 1995. The Profitt plaintiffs filed suit in Bexar County on August. 25, 1995. The Carey parents, who did not sue for the benefit of all, brought their action in Dallas on August 30, 1995, and Michelle Carey, on behalf of the Estate and the remaining statutory beneficiaries, joined the Profitt plaintiffs in the San Antonio action on August 31, 1995. The trial court found that Michelle Carey invited the Carey parents to join in the San Antonio intervention, but they declined. We find that the trial court correctly applied Section 71.004(c) to the facts of this case in its findings of fact that the proper plaintiff representative after July 19, 1995, was the executor of Captain Carey's estate, his widow, Michelle Carey. *See id.* Appellant's issue number nine is overruled.

## SETTLEMENT CREDITS

The Careys settled separately with Learjet and with Lear–Romec prior to trial against Serv–Air. This occurred several months before trial. Michelle Carey, her children, the Carey Estate, and the Carey parents settled individually with Learjet and Lear–Romec. At trial, Serv–Air elected a dollar-for-dollar credit. The trial court apportioned the settlement credits according to the amounts ultimately received by each party. In its eleventh issue, Serv–Air complains that the trial court should have credited the entire Learjet/Lear–Romec settlement against the judgment, including the settlement accorded the Carey parents. The Carey parents received nothing by way of a jury verdict or judgment because they were never formally joined prior to judgment. They, instead, received an assignment from the Carey Estate's executor or Michelle Car-

ey, as the case may be, and have relinquished all causes of action against Serv–Air.

The Supreme Court has recently clarified this issue, directing a court to view the entire family, such as the Carey family, as one "claimant" for section 33.012(b)(1) purposes, and therefore, "the total of all damages to be recovered by the family must be reduced by the total of all settlements received by the family." *See Drilex Systems, Inc. v. Flores,* 42 Tex. S.Ct. J. 959, 965 (July 1, 1999) [1999 WL 450793, motion for rehearing filed July 16, 1999]; *see also* TEX. CIV. PRAC. & REM.CODE § 33.012(b)(1) (requiring that the sum of the dollar amounts of all settlements entered into by a claimant be deducted from the amount of damages to be recovered by that claimant). We, therefore, sustain Serv–Air's eleventh issue. Applying the *Drilex* formula adopted by the Supreme Court, the recovery to the Carey parties from Serv–Air is modified as follows: Michelle Carey's recovery is reduced from $2,142,277 to $1,942,721. Patrice Carey's recovery is increased from $192,921 to $185,774. Shawn Carey's recovery is increased from $171,921 to $174,632. Chris Carey's recovery is reduced from $234,921 to $208,056. The Carey Estate's recovery is reduced from $148,959 to $79,802. Thus, the total recovery for actual damages to the Carey parties against Serv–Air shall be reduced from $2,891,000 to $2,590,985.

The judgment of the trial court is affirmed as modified.

**GREEN, Justice, concurring and dissenting.**

I concur with the result reached by the majority except on the question of gross negligence.

Although the consequence of Serv–Air's negligence was tragic and enormous, the record does not support a finding that Serv–Air acted with conscious indifference to the rights, safety or welfare of others in the face of extreme risk. *SeeUniversal Services Co., Inc. v. Ung,* 904 S.W.2d 638,

641 (Tex. 1995). To the contrary, the record shows Serv-Air attempted to repair the aircraft, albeit negligently.

Considering what the Serv–Air maintenance personnel were told when the aircraft was turned over to them—that the flight data recorder circuit breaker would not reset and that fuel would not transfer aft—there is nothing to suggest that what they did or failed to do created an "extreme degree of risk" or the "likelihood of serious injury." *Id.* Moreover, there is no evidence that Serv–Air had "actual, subjective awareness" of the risk involved; that is, that they knew the aircraft was not airworthy, but released it to the pilots anyway. *Id.* In short, neither the objective nor the subjective prongs of the gross negligence test have been satisfied. *See id.*

I therefore dissent to that part of the majority opinion and judgment that affirms the gross negligence finding and the award of punitive damages.

### OPINION ON MOTIONS FOR REHEARING AND REHEARING *EN BANC*

LOPEZ, Justice.

Michelle Carey, in her several representative capacities, filed a motion to correct the judgment in two respects to reflect the majority's ruling to affirm the trial court judgment, and these requested corrections shall be granted. Accordingly, the judgment shall be corrected to include joint and several liability against the sureties on the supersedeas bond. The judgment shall also be corrected to award exemplary damages to Michelle Carey, individually, as well as in her representative capacities.

Carey also seeks rehearing on the settlement credit issue. The civil practice and remedies code defines "claimant" as a "party seeking recovery of damages." TEX. CIV. PRAC. & REM.CODE § 33.011(1) (emphasis added). The supreme court recently clarified the proper procedure for applying settlement credits when all of the plaintiffs are seeking damages for injury

to the same person. *Drilex Systems, Inc. v. Flores,* 1 S.W.3d 112, 115, 120–24 (Tex. 1999). In *Drilex,* all of the Flores family were party-plaintiffs seeking recovery of damages for the injuries suffered by Jorge Flores. Thus, they were all included in the term "claimant" and treated as one claimant for purposes of applying the dollar-for-dollar credit. *See id.;* TEX. CIV. PRAC. & REM.CODE § 33.012(b).

The Carey settlement is distinguishable from *Drilex,* however, in that the Carey parents, who settled separately with Learjet and Lear–Romec, were never parties to the Bexar County lawsuit. They had a separate lawsuit pending in Dallas. The Carey parents do not come within the definition of "claimant" for purposes of this lawsuit and this defendant. Our original opinion, therefore, went beyond the Code and *Drilex* and expanded the definition of "claimant" to non-parties who also achieve settlements with whomever for whatever reason. That was not our intention. On reconsideration, Serv–Air's eleventh issue is overruled, and Serv–Air is not entitled to a credit for any settlement amount accorded the Carey parents by Learjet and Lear–Romec.

Serv–Air's motion for rehearing *en banc* is overruled. Our amended judgment of August 31, 1999, is withdrawn, and a new judgment which incorporates the changes noted in this opinion shall issue.

GREEN, Justice, concurring and dissenting.